Carl C. DUGAN and Louise Dugan, husband and wife, Plaintiffs and Counterclaimants,

v.

Luther Eugene JONES and Betty Elvira Jones, husband and wife, Defendants, Counterclaimants, Third-Party Plaintiffs and Appellants,

v.

O. B. OBERHANSLY, Lester Clan Stilson and United Farm Agency, a Utah Corporation, Third-Party Defendants and Respondents.

No. 16334.

Supreme Court of Utah.

July 23, 1980.

J. Kent Holland of Hanson, Russon, Hanson & Dunn, Salt Lake City, Ray E. Nash, Vernal, for plaintiffs and counterclaimants.

Jackson Howard, Provo, for third-party defendants and respondents.

MAUGHAN, Justice:

Dugans, the plaintiffs, brought this action to foreclose on a note and mortgage executed by the Joneses. Defendants filed a counterclaim and third-party complaint against the realtors, alleging fraud, negligent misrepresentation, breach of contract, and breach of fiduciary duty. The trial

court, having refused defendants' request for a jury, found for plaintiffs on their foreclosure action, dismissed .defendants' counterclaim, and allowed them no recovery on their third-party complaint. This cause is reversed and remanded for a new trial on all issues in accordance with this opinion. Costs to Joneses.

The factual background of this lawsuit is as follows: On February 11, 1972, O. B. Oberhansly, a real estate salesman for United Farm Agency, took an exclusive listing on the property of Carl C. and Louise Dugan, located in Jensen, Utah. The listing, signed by Mr. Dugan, was for a store and out-buildings on 22 and ¾ acres of flat terrain, 18 of which was tillable. The property was further described as having 12 acres of native pasture and 8 of irrigated improved pasture. The United Farm Agency catalogue for Spring 1973, incorporated the description in the listing. It further stated the property had a ¼ mile river frontage and was situated in proximity to a number of tourist attractions, including Dinosaur Land. Luther E. and Betty Jones, then living in Morgan Hill, California, responded to the listing, and visited the property on February 20, 1973, in company with Oberhansly. The Dugans were living on the property and were operating the store. The following day, the Joneses made an offer to purchase the property for $50,000 and executed a deposit receipt and agreement of sale with the Dugans. The agreement stated the amount of land involved was approximately 22 and ¾ acres. In accordance with the agreement, the Joneses paid $500 in earnest money; in April 1973, $4,500; and an additional $3,500 at the date of possession in June. They assumed an existing mortgage for $5,000, and purchased the inventory of the store for some $10,000.

The parties closed the transaction on July 2, 1973, in the office of the Dugans' attorney. The closing documents contained a legal description of the land the Joneses were purchasing but no statement as to the number of acres involved. In reality, the total acreage conveyed to the Joneses was not 22 and ¾, but approximately 6.9 acres. The Joneses entered into possession of the premises and made monthly payments under the note until November 1976. They discovered the discrepancy in acreage in September 1976, when an appraiser looked over the land, and the plot plan, as part of an effort by the Joneses to obtain a campground franchise. In November 1976, on the advice of counsel, the Joneses, with notice to the Dugans, began making their mortgage payments into a bank account.

In January 1977, the Dugans filed a complaint seeking foreclosure of the mortgage. The Joneses answered, and filed a counterclaim and third-party complaint, naming as counterclaim defendants the Dugans; and as Third-party defendants Oberhansly, his broker, Lester Clan Stilson, and United Farm Agency. The counterclaim, as later amended, sets forth three counts, the first for fraud and deception, the second for negligent misrepresentation, and the third for breach of contract. As damages, the Joneses claimed $96,000 based on the discrepancy in acreage; $75,000 consequential damages for being prevented from affiliating with United Campgrounds; [1] $50,000 for breach of an alleged representation Dugans would release or subordinate from the mortgage a parcel large enough for the Joneses to build a new house; and $50,000 punitive damages. In their amended third-party complaint, the Joneses asserted against Oberhansly claims of fraud and deceit; negligent misrepresentation; breach of fiduciary duty toward the Joneses; and breach of fiduciary duty toward the Dugans. In their claim against Stilson and United Farm Agency, Joneses asserted Oberhansly acted within the scope of his authority, and Stilson and United Farm breached their duty to supervise properly

---

1. United Campgrounds required a minimum of ten acres for a campground franchise. Joneses purchased the property with the intent of obtaining such a franchise.

their agent. The third-party complaint repeated the demands for actual, consequential, and punitive damages.

On appeal, the Joneses claim they were entitled to have a jury determine the factual issues raised in their claims for fraud, negligent misrepresentation and breach of duty. We agree.

■ In *State Bank of Lehi v. Woolsey*,[2] this Court denied the mortgagor, in a foreclosure proceeding, the right to a jury trial for legal issues concerning the underlying debt for which the mortgage was given as security. We explained the mortgagee's interest is not an estate, but a mere lien, an appendage of the debt, incapable of being separated from the debt and transferred by itself. The mortgagee has no legal remedy on the mortgage, no power to recover possession of the land, and can enforce the lien against the land in no legal action. The court of equity grants relief by enforcement of the lien, viz., by sale of the premises and application of the proceeds upon the debt. The right asserted by the mortgagee in a foreclosure proceeding is equitable, and this equitable right does not exist separately or independently of the underlying obligation. Thus, the threshold question for the chancellor in a foreclosure proceeding involves the issues concerning the underlying indebtedness. The court in order to determine if the mortgagee be entitled to a decree of foreclosure must necessarily determine there is a debt secured by a mortgage. If there be no debt there is nothing upon which the power of the court could be exercised. There can be no initial step towards a decree of foreclosure without resolving the question of the mortgagor's indebtedness.

■ It was pointed out there is a distinction between exclusive equity jurisdiction and concurrent equity jurisdiction. In the latter, a party may seek two unrelated remedies, viz., damages (a legal remedy), and an injunction, an equitable remedy. In such a case, the equity court has concurrent jurisdiction over the demand for an award of damages, which is not a prerequisite to granting an injunction. In contrast, in a foreclosure proceeding, the mortgagee's right to a money judgment is not a separate matter, but a prerequisite to the equitable relief demanded.

The Joneses by electing to seek damages, rather than rescission, have affirmed the underlying note and mortgage. The legal issues which they sought to have submitted to the jury involved questions that are independent and unrelated to the amount of indebtedness of their promissory note for which the mortgage constituted security.

This case is analogous to *Valley Mortuary v. Fairbanks*,[3] wherein the plaintiff had brought an action to enjoin the defendant from operating a mortuary in breach of a covenant not to compete and for damages for violations of the agreement. The trial court denied the defendant a jury trial on the issues of fact arising from the action for damages, holding the main object of the action was injunctive relief and that the damage claims were incidental. This Court reversed and remanded for a new trial on the damages issue, stating:

"When in this state, a plaintiff in his complaint states two complete causes of action—one entitling him to equitable relief and the other entitling him to legal relief—as the plaintiff has done in the instant case, . . . there is no persuasive reason why either party should not be entitled, upon timely demand, to a jury to determine the issues of fact raised by the legal causes of action."[4]

■ In the present action, plaintiff is asserting the equitable claim and defendant is asserting the legal claims, rather than the plaintiff asserting both types of claims. This difference does not change our conclu-

**2.** Utah, 565 P.2d 413, 415–416 (1977).

**3.** 119 Utah 204, 225 P.2d 739 (1950).

**4.** Id. 225 P.2d at 749–50.

sion. In *Valley Mortuary*, the court cited a California decision, *Connell v. Bowes*,[5] in which the court, after stating the rule in California allows a jury trial of legal issues raised in a complaint which also states equitable issues, extended the rule "to cases where the complaint states a purely equitable cause of action and the defendant cross-complains for legal relief."[6] We hold similarly, where plaintiff brings a foreclosure action and defendant counterclaims and files a third-party complaint alleging unrelated counts of fraud, negligent misrepresentation and breach of duty, defendant is entitled, upon timely request, to have a jury decide its legal claims.

### Expert Witness Preclusion

█ Defendants claim they should have been allowed to call expert witnesses at trial to aid the trier of fact in determining the amount of damages. We agree and hold the trial court abused its discretion, under the circumstances of this case, in excluding testimony from defendants' experts.

On January 24, 1978, the trial court held a pretrial conference at which it was decided the parties would exchange, at least 15 days before trial, the names of expert witnesses to be called concerning damages. The court did not have any of the parties submit a pretrial order, nor did it prepare one itself. When the trial was held almost 11 months later, defendants had not provided an expert witness list. Upon objection of counsel for third-party defendants, the court excluded defendants' experts from testifying. The effect of the court's action is seen in the trial judge's finding that "there was no competent evidence introduced from which the Court could award

more than nominal damages to the third-party Plaintiff" and its determination that the proper measure of damages was the difference between the value of the property as represented and its actual value. The court also found there was no competent evidence from which it could find the value of the deficient acreage, even if it determined the purchasers were entitled to an abatement of the purchase price for the deficiency.[7] By excluding defendants' experts, the court effectively precluded them from proving their case.

█ Rule 16(5), U.R.C.P., parallels rule 16(6) of the Federal Rules of Civil Procedure. As stated in *Sill Corporation v. United States*,[8] "Pretrial orders are, to be sure, blueprints for the trial which ought not to be relaxed in the absence of good cause, but they are not hoops of steel and may always be modified in the interest of the administration of justice." In determining whether to modify a pretrial order in the interest of justice, the court should consider the possible prejudicial effects of its enforcement of the order. Here, as seen, the prejudicial effects of preclusion were severe.

Several other factors influence our decision to reverse the trial court on this issue. First, the court's order was never reduced to writing. Although this court is not aware of an explicit statutory requirement that pretrial orders in this state be written, the practice is to be encouraged. Particularly when long periods of time elapse between the pre-trial conference and the trial, written pretrial orders reduce the chances for confusion or memory lapses as to what actually was the agreement at the conference. Preparation of a pre-trial order need not be an administrative burden, since the

---

5. 19 Cal.2d 870, 123 P.2d 456 (1942).

6. *Valley Mortuary*, supra, 225 P.2d at 746.

7. Findings of Fact and Conclusions of Law, Paragraphs 12 and 13.

8. 343 F.2d 411, 420; *cert. den.* 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (10th Cir. 1965).

practice of assigning counsel to prepare an order is well established.[9]

Second, the matter was tried before the court without a jury. The court could have allowed defendants to present their evidence and put on their witnesses, following which it could have determined whether a continuance was merited for opposing counsel to obtain their own expert witnesses. The possible inconvenience to the court in this case does not outweigh the prejudice to defendants, resulting from the exclusion of their experts.

Third, the court could have used means other than exclusion to sanction defendants for their noncompliance with the order, including imposing costs incurred by the other parties in obtaining experts. This procedure was suggested in *Matheny v. Porter*,[10] where the court discussed alternatives to a trial court preclusion order imposed, because defendant did not respond to a pretrial order.

### Fraud Of Vendors—Dugans

The trial court dismissed the counterclaim of Joneses on the ground the evidence was not clear and convincing the Dugans had perpetrated a fraud. The Joneses contend the essential elements of fraud were pleaded and proved.

Mr. Dugan, at first denied, but later conceded he informed Mr. Oberhansly his parcel contained 22¾ acres, of which six to eight were irrigated. Mr. Dugan further testified, when the Joneses visited the property in February, prior to their offer to purchase, he did not walk the land with them to inspect the boundaries, and one could not see all the land from the point from which he showed it. Mr. Dugan testified he thought his property line went to the east bank of the river, and the description to the west bank was merely to avoid paying property taxes on the acreage under the river.

Mrs. Jones testified they had never owned property as large as one acre prior to moving to Utah. The advertisement in the catalogue of United Farm Agency appealed to them because of the acreage and close proximity to tourists' attractions. At the time they visited the property it was snowing and was too cold to examine it. Mrs. Jones claimed they informed Oberhansly of their plans to build a campground, and he orally represented there were 22¾ acres. Mrs. Jones was concerned over the acreage, because she had been advised by her uncle, who operated a campground of the need for fifteen acres for such an enterprise. Mrs. Jones was never informed any acreage was purportedly under the river. Mrs. Jones explained they discovered the discrepancy in the acreage when they applied for a loan to construct the campground. An appraiser came to the property, and he informed then they had approximately 6½ acres rather than 22¾ acres. This discovery occurred on the Labor Day weekend in 1976. Thereafter a letter was sent to Dugans informing them the mortgage payments would be put in a bank account in Walkers at Vernal, Utah, until the parties could resolve the dispute. Such course was taken, commencing in December, 1976. At the time of trial, December, 1978, $8,835.63 had been deposited in this account.

Ethel Au Miller, the Dugans' vendor denied she had ever informed Dugan she was selling them land under the river. Her deed to them further indicated the boundary as the west not the east bank of the river.

Mr. Jones testified Oberhansly never told him the dominant portion of the property was under the river, although he did inform Jones the river ran across approximately two acres of the property, leaving a parcel of approximately twenty acres. Mr. Jones testified they would not have come to Utah, if they had known the small size of the

**9.** A helpful discussion of pretrial orders by Judge A. Sherman Christensen is found at 29 F.R.D. 362.

**10.** 158 F 2d 478, 480–81 (10th Cir. 1946).

property, because six acres were insufficient for recreational purposes.

Mr. Oberhansly, the real estate salesman, testified he obtained the information set forth on the listing agreement from Mr. Dugan, viz., 22¾ acres of flat terrain; 18 tillable acres; 8 irrigated and 12 acres of natural pasture. Oberhansly denied Dugan informed him 16 to 18 acres were in the river. Oberhansly further denied the Joneses expressed any purpose to use property for recreation.

█ The elements of an action in deceit based on fraudulent misrepresentation are: (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.[11]

The ruling of the trial court was apparently predicated on the failure of the Joneses to establish by clear and convincing evidence Dugan had knowledge of the falsity of his representation.[12]

█ In *Sorenson v. Adams*,[13] a case with substantial similarity to the instant one, the court observed, under the doctrine of constructive fraud there is a well-established exception that a representation must be made knowingly, willfully, and with intent

to deceive.[14] Thus, in a case where the circumstances impose upon the vendor a special duty to know the truth of his representations or where the nature of the situation is such the vendor is presumed to know the facts to which his representation relates, a misrepresentation is fraudulent even though not made knowingly, willfully or with actual intent to deceive.

The Court explained:

"In short, the general rule is that 'a vendor may be liable in tort for misrepresentations as to the area of land conveyed, notwithstanding such misrepresentations were made without actual knowledge of their falsity.' Annot., Tort Liability for Damages for Misrepresentations as to Area of Real Property Sold or Exchanged, 54 A.L.R.2d 660, 680 (1957). The reason, of course, is that the parties to a real estate transaction do not deal on equal terms. An owner is presumed to know the boundaries of his own land, the quantity of his acreage, and the amount of water available. If he does not know the correct information, he must find out or refrain from making representations to unsuspecting strangers. 'Even honesty in making a mistake is no defense as it is incumbent upon the vendor to know the facts.' "[15] [Citations]

In the Restatement, Torts 2nd, Sec. 538A, Comment e, p. 84, it is stated:

"*Quantity as a fact.* A statement of the quantity of either land or chattels is a statement of fact. A purchaser of either is entitled to assume that the vendor knows the acreage of the land or the

circumstances under which it takes place . . . ."

---

11. *Pace v. Parrish*, 122 Utah 141, 144–145, 247 P.2d 273 (1952).

12. The trial court ruled, if the Joneses had timely brought their action, they might have prevailed upon a theory of mutual mistake, breach of contract, partial failure of consideration or some other similar contract basis.

13. 98 Idaho 708, 571 P.2d 769, 775–776 (1977).

14. See 37 Am.Jur.2d, Fraud And Deceit, Sec. 4, p. 23, for definition of constructive fraud. ". . . It is presumed . . . from the

15. Also see *Weinstein v. Sprecher*, 2 Wash. App. 325, 467 P.2d 890, 892 (1970); *Piazzini v. Jessup*, 152 Cal.App.2d 58, 314 P.2d 196, 198 (1957); *Liner v. Armstrong Homes Of Bremerton, Inc.*, 19 Wash.App. 921, 579 P.2d 367, 370 (1978); *Carpenter v. Egli*, 272 Or. 337, 536 P.2d 1236 (1975); *Clark v. Haggard*, 141 Conn. 668, 109 A.2d 358, 54 A.L.R.2d 655 (1954).

quantity of a lot of goods that he is selling. This is true although the vendor's statement does not assert or imply that it is based upon a survey of the land or a measurement, weighing or count of the goods."

█ Furthermore, a vendee of real property, in the absence of facts putting him on notice, has no duty to investigate to determine whether the vendor has misrepresented the area conveyed.[16] Neither is a vendee estopped from recovering for misrepresentation of the area of the land conveyed merely because he viewed or inspected the premises, so long as he did not endeavor to determine independently the exact quantity of land.[17] Nor is a vendee estopped from recovering in an action for deceit because he had the opportunity to inspect or otherwise check the property prior to purchase.[18]

█ The proper measure of damages in an action for fraud and deceit is the difference between the value of the property purchased and the value it would have had, if the representations were true, viz., the benefit of the bargain rule.[19]

█ The trial court further found the Joneses, by entering into possession and so remaining from July 1973 to the time of trial, and accepting the benefits of purchase and making regular monthly payments for three years, and refusing to amend their pleadings to pray for rescission, waived any claim for the deficiency in acreage. The trial court erred in this ruling.

█ The plaintiff in an action for fraud has the option to elect to rescind the transaction and recover the purchase price or to affirm the transaction and recover damages. The choice of remedy belongs to the victim of the fraud, and a choice cannot be forced upon him.[20] In *Pace v. Parish*[21] this court observed, the plaintiffs, who had made substantial payments on the purchase price, were entitled to proceed with their performance and recover damages for misrepresentations.

█ As to the finding of waiver, the court in *Chester v. McDaniel*[22] pointed out certain important distinctions in the type of waiver involved. The court observed, any delay on the part of the defrauded party, especially his remaining in possession of the property received by him under the contract, and dealing with it as his own, may constitute a waiver of the right to rescind the contract. However, the right to recover damages for the fraud upon the affirmance of the contract is not so easily lost, for the defrauded party, who does not discover the fraud until he has partly performed, may go forward with the contract, keep what he has received, and still maintain his action for damages. It is only when there is a new agreement between the parties, after discovery of the fraud, the court may find a waiver of the fraud action.

In *Hawthorn-Mellody, Inc. v. Driessen*,[23] the court observed the party does not waive the fraud by an election to affirm the contract, complete its performance, and retain what was received under it; and such a party is not precluded from recovering damages sustained by reason of the fraud because of delay, if his action is begun within the period fixed by the statute of

---

**16.** 54 A.L.R.2d 660, Sec. 11, pp. 687–688.

**17.** Id. Sec. 13, p. 690.

**18.** Id. Sec. 14, p. 694.

**19.** *Pace v. Parrish*, note 11, supra; *Lamb v. Bangart*, Utah, 525 P.2d 602, 609 (1974); *Dilworth v. Lauritzen*, 18 Utah 2d 386, 389, 424 P.2d 136 (1967); *Fox v. Wilson*, 211 Kan. 563, 507 P.2d 252, 267 (1973); also see 13 A.L.R.3d 875, 885.

**20.** *Rogers v. Crest Motors, Inc.*, Colo.App., 516 P.2d 445 (1973); *Mecham v. Benson*, Utah, 590 P.2d 304 (1979).

**21.** Note 11, supra, at 150 of 122 Utah, 247 P.2d 273.

**22.** 264 Or. 303, 504 P.2d 726, 727–728 (1972).

**23.** 213 Kan. 791, 518 P.2d 446, 451 (1974).

limitations. The language of the court is particularly apropos in the instant case, where it stated:

"In this case the court erred in refusing to consider the defendants' counterclaim seeking to recover damages for fraudulent representation, because defendants did not promptly rescind the contract after the fraud was discovered. Under the law they were not required to do so."

Upon retrial of this complete case, it would be appropriate for the trial court to exercise its equitable power to determine if a decree of foreclosure should be issued. The Joneses have made all their mortgage payments into a separate bank account and notified the Dugans of their claim. The trial court might find it equitable to order this fund paid to the Dugans and to deny foreclosure.

". . . since a suit to foreclose a mortgage is an equitable action, the chancellor has the right to deny foreclosure based upon an acceleration where there are substantial equities which would render the acceleration unconscionable."[24]

### Realtors' Duty to Purchasers

The Joneses claim the trial court erred in dismissing the third-party defendants because they breached a duty owed to them as purchasers. They claim a real estate agent owes a fiduciary duty not only to the seller of property who employs him, but to a purchaser of the property.

 Under Utah law, the general rule is no fiduciary obligations exist between a buyer and seller of any property.[25] A real estate agent, however, does not occupy the position of a lay vendor of property. An agent is licensed by the state[26] and is re-

quired to meet standards of "honesty, integrity, truthfulness, reputation, and competency."[27] A real estate license may be revoked if the licensee is unable or unworthy to safeguard the interests of the public.[28]

In a case somewhat analogous to the present action, *Elder v. Clawson*[29] a real estate broker misrepresented to prospective purchasers the nature of a weed found upon the farm he was showing them. After they purchased the land, plaintiffs discovered the weed was noxious and a quarantine had been imposed on the farm. This court held plaintiffs had a right to rescind the contract of sale. In a concurring opinion Mr. Justice Crockett discussed the plaintiffs' right to rest some confidence in the agent's assertions:

"The plaintiffs were people who were practically without farm experience or knowledge. Mr. Kay Elder had contacted the defendants' agent (the co-defendant) Mr. Van Tassell, who was a licensed real estate broker, for the purpose of inquiring about the purchase of a farm. Plaintiffs had the right to assume that he had both the expertise and the integrity required to qualify him to serve in that capacity. By reason of this they could repose some confidence in his knowledge and in his honesty."[30]

 In this state, it is apparent that the rule of caveat emptor does not apply to those dealing with a licensed real estate agent. Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and is answerable at law for breaches of his or her statutory duty to the public.

 The Joneses attempted to introduce evidence through a witness, William H.

**24.** *State Bank of Lehi v. Woolsey*, Utah, 565 P.2d 413, 417 (1977).

**25.** *Cole v. Parker*, 5 Utah 2d 263, 300 P.2d 623 (1956).

**26.** Utah Code Ann., Sec. 61–2–1 (1953).

**27.** Id. at Sec. 61–2–6(a).

**28.** Id. at Sec. 61–2–11.

**29.** 14 Utah 2d 379, 384 P.2d 802 (1963).

**30.** Id. 384 P.2d at 805.

Beck, a retired former employee of the Real Estate Division, of the Utah Department of Business Regulation, as to the standard of care of a real estate agent to determine the accuracy of the information in a listing agreement. The trial court excluded the testimony and expressed a belief that a cause of action could not lie in tort on the basis of any negligence on the part of Third-party defendants. The trial court erred in this ruling.

This Court has recognized the tort of negligent misrepresentation in *Ellis v. Hale*[31] and *Jardine v. Brunswick*.[32] In the *Jardine* case, it was stated:

"Where one having a pecuniary interest in a transaction, is in a superior position to know material facts, and carelessly or negligently makes a false representation concerning them, expecting the other party to rely and act thereon, and the other party reasonably does so and suffers loss in that transaction, the representor can be held responsible if the other elements of fraud are also present."

*Jardine* cites the Restatement, Torts, Sec. 552. The current standards of the evolving tort of negligent misrepresentation are set forth in Restatement, Torts, 2nd, Sec. 552:

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered.

"(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."

Under comment e of Sec. 552 (p. 130), it is stated:

"Since the rule of liability stated in Subsection (1) is based upon negligence, the defendant is subject to liability if, but only if, he has failed to exercise the care or competence of a reasonable man in obtaining or communicating the information. . . .

"The particulars in which the recipient of information supplied by another is entitled to expect the exercise of care and competence depend upon the character of the information that is supplied. When the information concerns a fact not known to the recipient, he is entitled to expect that the supplier will exercise that care and competence in its ascertainment which the supplier's business or profession requires and which, therefore, the supplier professes to have by engaging in it. Thus the recipient is entitled to expect that such investigations as are necessary will be carefully made and that his informant will have normal business or professional competence to form an intelligent judgment upon the data obtained. . . ."

The Joneses further claimed real estate agent, Oberhansly, perpetrated a fraud through his representations concerning the release of a home site by the Dugans. The evidence adduced by the Joneses and Oberhansly was sharply contradictory, and the ruling of the trial court as to Oberhansly's alleged fraud is unclear. The trial court merely found there was no competent evidence to award more than nominal damages to Third-party plaintiff, and the proper measure of damages was the difference between the value of the property as represented and its actual value.

The record indicated that after the original offer by Joneses, they requested Ober-

**31.** 13 Utah 2d 279, 373 P.2d 382 (1962).

**32.** 18 Utah 2d 378, 381, 423 P.2d 659 (1967).

hansly to arrange an agreement with Dugans, to release or subordinate from their mortgage a parcel of ground to construct a home. Mrs. Jones testified the existing living quarters were situated on the highway, and she wished to protect her young children from the heavy traffic by locating a home farther back on the land. The Joneses refused to execute the deposit receipt and pay the remaining $4,500 until an agreement concerning the home site was arranged.

The Joneses received a letter from Oberhansly, dated March 19, 1973, in which it was stated:

> "Mr. Dugan has agreed to give you a homesite and take a 2nd mortgage back on that."

Thereafter, in reliance on the representation, the Joneses mailed their check and executed a deposit receipt contract in April 1973.

On March 26, 1973, Oberhansly attempted to have the Dugans reduce the agreement concerning the homesite to writing. The Dugans attached certain conditions for the subordination of the property, viz., the payments of the mortgage must be current, there must be a full inventory in the store, the Joneses were required to discharge a mortgage the Dugans had on the property and in addition pay Dugans an "extra $3,000 cash." Oberhansly testified he informed the Joneses of these conditions, and they reluctantly consummated the transaction.

The Joneses vigorously denied any knowledge of the conditions until Mr. Jones was excavating the basement and was interrupted by Dugan, who informed him he was violating the agreement. Jones immediately sought out Oberhansly, who gave him a copy. This agreement, containing the conditions, is a hand-written unilateral statement, signed by the Dugans, and witnessed by Oberhansley. It is free of any indication the Joneses knew or were made aware of its contents.

According to the Joneses, the first time they learned of the conditions was April 24, 1974. The Joneses did not immediately start an action on this matter, because they intended to pay off the Dugans as part of the program to finance and construct a campground.

If the trier of fact believed the facts as related by Joneses, they had established a basis to recover for fraudulent misrepresentation. The Joneses introduced evidence to prove damages, showing an increase in the costs of the home they had intended to construct if the subordination agreement had been as represented by Oberhansly. Although the trial court was correct as to the measure of damages, it overlooked that principle of law holding "the defrauded party may recover any additional damages which are a natural and proximate consequence of the defendant's misrepresentations.[33]

CROCKETT, C. J., and WILKINS and HALL, JJ., concur.

STEWART, J., concurs in result.

---

**33.** *Russell v. First American Mortgage Company*, Colo.App., 565 P.2d 972, 974 (1977); also see Restatement, Torts 2nd, Sec. 549. ·