746 F.2d 1420
 CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Plaintiff, Appellee,
v.
Calvin C. DREDGE and Alicia A. Dredge, Defendants,
Cross-Claimants, Counterclaimants, Appellants,
v.
WELLS FARGO BANK, N.A., Defendant, Cross-Defendant, Appellee.
 No. 82-2388.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 25, 1984.
 
 William D. Olson of Racine, Olson, Nye & Cooper, Pocatello, Idaho (Theodore Boyer, Jr., of Clyde, Pratt, Gibbs & Cahoon, Salt Lake City, Utah, with him on the brief), for appellants.
 Stephen G. Crockett of Rooker, Larsen, Kimball & Parr, Salt Lake City, Utah (Robert B. Lochhead and Thomas B. Green, Salt Lake City, Utah, with him on the brief), for appellee Connecticut General Life Ins. Co.
 Richard H. Nebeker of Greene, Callister & Nebeker, Salt Lake City, Utah (Richard K. Nebeker, Salt Lake City, Utah, with him on the brief), for appellee Wells Fargo Bank, N.A.
 Before HOLLOWAY, Chief Judge, and SETH and LOGAN, Circuit Judges.
 SETH, Circuit Judge.
 
 
 1
 This appeal arose from a foreclosure action brought by Connecticut General Life Insurance Company in the Bankruptcy Court for the District of Utah. Connecticut General claimed a first mortgage on a farm and appellee Wells Fargo Bank claimed a second mortgage. The bankruptcy court reordered the priorities under the doctrine of equitable subrogation and gave first priority to the mortgage of the original owners, the Dredges, but permitted Connecticut General to foreclose subject to the Dredges' lien. On appeal the District Court for the District of Utah reversed and changed the result giving the former owners the third position.
 
 
 2
 The foreclosure action was instituted against property which the Dredges sold in 1978. Western Farm Management acted as agent for the Dredges in the sale and also acted on behalf of the buyers of the property, the Hoggans, for a fee in appraising the property and in procuring Connecticut General to be a long term lender to the buyers. Western Farm had a contract with Connecticut General and had frequently acted as a source of loan referrals as it did in this instance.
 
 
 3
 The agents found buyers as indicated. The buyers were to convert the property from grazing land to farmland. They were not able to pay the entire purchase price ($2,900,000) outright, and the sellers, the Dredges, had to carry part of it. This arrangement had to be negotiated along with the loan the buyers were obtaining from Connecticut General and the priorities agreed upon. This was done by the agent Western Farm who was arranging the loan to the buyers from Connecticut General. The negotiations also included the timing of the loan disbursements to the Hoggans who were the buyers.
 
 
 4
 The loan from Connecticut General was to be in two disbursements. The first was to be made at a closing in 1978 and the second was to be made when the Hoggans provided Connecticut General with agreed upon assurances regarding grazing permits, water rights and other matters on or before May 1, 1979.
 
 
 5
 The transaction was complicated by the fact that the Hoggans purchased the property to convert it from ranchland to irrigated farms. This was understood in the negotiations for the sale and the financing by the Dredges and Connecticut General. The financing of the irrigation system was included in the negotiations. The Hoggans borrowed money from Wells Fargo to finance construction of the irrigation system and executed a mortgage on the property. The debt to Wells Fargo as interim financing was to be paid after the Hoggans received the second disbursement of the funds from Connecticut General.
 
 
 6
 The Dredges also had a mortgage on the property to secure part of the purchase price which Connecticut General was not going to finance. The Dredges agreed that their lien take priority behind Connecticut General. It was to be after Wells Fargo's lien until Wells Fargo was taken out by Connecticut General's second disbursement and it would then become second to Connecticut General. Wells Fargo's loan was an interim loan, as mentioned, for the construction costs. The record does not disclose a reason but the contractor was not paid and Wells Fargo did not disburse the amount it agreed to. In any event, the contractor filed liens against the property. All the parties then sought to foreclose against the Hoggans. The Dredges were in the litigation and cross-claimed. This litigation was settled in 1980 when Connecticut General agreed to make a second disbursement secured by new notes and mortgages. A disbursement was necessary to remove the mechanic's liens.
 
 
 7
 The issues in this appeal center on the stipulations and dismissals in this litigation with the contractor and especially the disposition of the cross-claims.
 
 
 8
 In the settlement of the suit the Dredges stipulated to the dismissal with prejudice of their cross-claims against Connecticut General and Wells Fargo challenging the lien priorities of the parties. They also executed a full release in favor of Connecticut General and others. At Connecticut General's request, the Dredges subordinated their mortgage to the new mortgage of Connecticut General. New loans of a different nature were negotiated between the Hoggans and Wells Fargo, but their lien priority was maintained. These were no longer interim loans. The Dredges were not made aware of the changes and did not know that Wells Fargo would not be paid off by the second disbursement by Connecticut General as agreed.
 
 
 9
 The Hoggans soon defaulted on all obligations, and Connecticut General foreclosed. The Hoggans' bankruptcy brought the question of lien priorities into the bankruptcy court.
 
 
 10
 The Dredges argued to the bankruptcy court that they did not know at the 1980 settlement that Wells Fargo would not be paid off by Connecticut General's second disbursement as above mentioned. They assert that, had they known that they were to remain in third priority following the second disbursement, they would not have agreed to release their litigation claims against Connecticut General and Wells Fargo challenging lien priorities.
 
 
 11
 As mentioned, Western Farm had a long-standing contractual relationship with Connecticut General whereby Western Farm was hired to find borrowers and service loans. Thus Western Farm would receive fees, as it did here, from the Hoggans as borrowers as an agent, from Connecticut General as an agent and from the Dredges as an agent. The record does not show whether fees were so received from Wells Fargo. The Western Farm contract with Connecticut General obligated Western Farm to provide it a title whereby a first lien would be obtained. Also, an obligation was created to pass on the degree of risk in the loan and generally created duties to Connecticut General. Of these the most significant one here was the duty of Western Farm to itself remove liens on the property which arose after Connecticut General's lien was established. Thus it had a duty to pay off the contractor's lien in this instance if it was not otherwise removed. Western Farm thus had a real interest at the settlement in protecting itself and its principal, Connecticut General, from the liens for the irrigation system. Western Farm so participated in the settlement. This necessarily went also to the benefit of Wells Fargo who started as the entity making the interim construction loan. The settlement of the litigation, as it turned out, went only to the benefit of Connecticut General, Wells Fargo and Western Farm. Wells Fargo remained as a lien holder ahead of the sellers because it was not paid by the second disbursement by Connecticut General as originally agreed, and as understood by the sellers to be unchanged when the litigation was settled.
 
 
 12
 The bankruptcy court found that Western Farm, as agent for the Dredges, owed a fiduciary duty to inform the Dredges at the 1980 settlement that Wells Fargo was not going to be paid off from Connecticut General's second disbursement to the Hoggans. Thus Western Farm's failure to disclose constituted a breach of this duty. The bankruptcy court then found that, because Western Farm was also the agent of Connecticut General, its breach of fiduciary duty to the Dredges "tainted" Connecticut General's role in the transaction. Therefore, the Dredges were entitled to equitable relief as against Connecticut General, and both Connecticut General's and Wells Fargo's liens were subordinated to the Dredges' mortgage. The bankruptcy court exercised its equitable powers. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; LeaseAmerica Corp. v. Eckel, 710 F.2d 1470 (10th Cir.); In re Shannon, 670 F.2d 904 (10th Cir.).
 
 
 13
 On appeal the district court ruled that Connecticut General's liability could not be based on the breach of any duty owed by Western Farm to the Dredges because the scope of the agency relationship between Connecticut General and Western Farm did not extend to Western Farm's "independent" conduct as the broker in a real estate transaction to which Connecticut General was not a party. The court found that, because the Dredges had at least constructive notice of the agency relationship between Connecticut General and Western Farm, and because there was no finding by the bankruptcy court of fraud or constructive fraud committed by Connecticut General in the settlement, there was no basis on which to relieve the parties of their agreement.
 
 
 14
 The issue of this case was properly phrased by the district court as whether there was misconduct at the time of the settlement of the earlier mechanic's lien litigation which required the court to relieve the Dredges from the consequences of the dismissal and releases.
 
 
 15
 As a somewhat separate factor it is significant that memoranda of Western Farm's attorney revealed that Western Farm and Connecticut General were aware of the Hoggans' desperate financial condition in late 1979 and early 1980, when the settlement was made. Western Farm, Connecticut General and Wells Fargo were all in a position to know, and did know, that after the settlement the Hoggans would have a debt of approximately $1,000,000 which they would be unable to pay. Thus these parties were aware before the settlement that, after the settlement, the Hoggans would default on their loans and foreclosure would be necessary. They were aware that the Hoggans had defaulted on another loan by Prudential on other property.
 
 
 16
 It is necessary to consider the sale, the purchase, the long-term financing and the interim financing as an integrated transaction. All elements were related and each one was dependent on the other. The several parties were thereby involved in and dependent on the performance by the others. The attempt by Western Farm to wrap up the complete package with its diverse agency relationships and continuing negotiations also served to make it in reality a single transaction. To separate it into several elements distorts the relationship of the parties and the reality of the event.
 
 
 17
 The bankruptcy court found that Western Farm was an agent of the sellers at the time that the 1980 suit was settled. The district court did not find otherwise. The record supports the finding. This was also the time that Western Farm was fully aware of the insolvency of the buyers, and the time that it knew of the protection afforded Wells Fargo although a second disbursement was to be made. The settlement was made when Connecticut General and Wells Fargo were also fully aware of the buyers' insolvency and the imminent foreclosures. All parties knew of the insolvency of the buyers except the sellers. Western Farm had a duty to disclose this to the sellers but it did not do so.
 
 
 18
 The transaction was still open at the 1980 settlement. Connecticut General had not made the second disbursement for the basic financing; the title was not clear; the interim financing had somehow failed and a liability was asserted; and the sellers and Connecticut General were still negotiating the priorities of their liens.
 
 
 19
 The transaction was not closed and the agency of Western Farm continued as to the Dredges. This obligation included the finding of a solvent buyer. If the buyer became insolvent before the transaction was closed the agent had the duty to so inform the seller. See, Adams v. Kerr, 655 S.W.2d 49 (Mo.Ct.App.).
 
 
 20
 In Trinity Universal Ins. Co. v. Rocky Mountain Wholesale Co., 353 F.2d 574, 577 (10th Cir.), we said, " 'it is the duty of an agent to disclose to his principal all notice or knowledge which he may possess and which is necessary for the principal's protection or guidance' " (quoting Professor Mechem in 7 Mich.L.Rev. 113). Western Farm's duty to the Dredges was to inform them of the insolvency of the Hoggans and to advise them that Wells Fargo would not be paid off. Thus Western Farm had a duty to inform the Dredges that there was a critical change in existing agreements in that the Wells Fargo loan would not be paid off by the settlement. In the settlement, only Connecticut General requested that the Dredges subordinate their mortgage to Connecticut General's mortgage. Since Wells Fargo did not make the same request, the Dredges could reasonably believe that the original agreement was being honored. The material facts surrounding the settlement were essential to the ability of the Dredges to protect their security interest. We agree with the bankruptcy court that Western Farm breached its duty to disclose to the Dredges this important change.
 
 
 21
 Western Farm's obligation to Connecticut General included giving Connecticut General's lien a first priority. Had the settlement not been structured so as to pay off the materialman's liens Western Farm would have been contractually obligated to itself pay them. The structuring of the settlement was to the immediate benefit of Western Farm and for Connecticut General and Wells Fargo in the expected foreclosure, and to the detriment of the Dredges by placing them third.
 
 
 22
 Western Farm gained knowledge of the Hoggans' insolvency during the course of its agency with Connecticut General and with the sellers. Western Farm's failure to disclose to the Dredges accrued to the benefit of Connecticut General and Western Farm in the settlement and to the detriment of the sellers. Evidence was presented establishing that Western Farm considered that its primary interest in the 1980 settlement was to protect Connecticut General as its principal. Thus Western Farm believed it was acting, and was acting, within the scope of its agency with Connecticut General, and Connecticut General accepted the benefits of Western Farm's failure to disclose to the Dredges the material facts as to the settlement.
 
 
 23
 The fact that mechanic's liens were filed did not necessarily indicate that the buyers were insolvent. The interim financing was part of the negotiations and Wells Fargo was to take care of such payments. The liens indicated instead a failure by Wells Fargo.
 
 
 24
 Liability for an agent's misconduct may be imposed on the principal when carried out within the scope of the agent's authority, and the misconduct may include omissions by the agent or acts which cause loss to a third person who follows an instruction given by the agent. A principal may be found liable for an unauthorized act of the agent if he ratifies the act by accepting the benefits thereof.
 
 
 25
 Connecticut General asserts that it cannot be liable for Western Farm's breach of its fiduciary duty as a "brokerage" agent. The sales agency cannot be separated from Western Farm's participation in the entire transaction. Insofar as Western Farm was doing a disservice to the Dredges, it was serving Connecticut General as well as Wells Fargo and itself incidentally. Western Farm had a classic conflict of interest which it failed to successfully resolve in the settlement. Thus liability for Western Farm's impropriety in the exercise of its agency relationship with Connecticut General, which impropriety also constituted the breach of fiduciary duty as agent to the Dredges, may be imposed on Connecticut General.
 
 
 26
 The bankruptcy court found that "Connecticut General knew of Western Farm Management's actions in its behalf in a time when it stood in conflict" and that Connecticut General's conduct did not "meet the standards of absence of involvement, absence of knowledge and the standards of good faith."
 
 
 27
 "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction."
 
 
 28
 Restatement (Second) of Contracts, Sec. 164(2).
 
 
 29
 Thus Western Farm's and Connecticut General's superior knowledge and concealment of the material facts of the settlement provide a basis for relieving the Dredges of the release agreement, particularly since Connecticut General was in fact a party to the transaction. See also, Dugan v. Jones, 615 P.2d 1239 (Utah), and Elder v. Clawson, 384 P.2d 802 (Utah). As the bankruptcy court said:
 
 
 30
 "Where one, as Connecticut General is aware of double agency; where it knows that its agent has been sent out in the world to find purchasers; where it knows that its agent owes a duty or [sic] sellers; where it knows that its agent owes a duty to that seller; where it knows the transactions are being structured to the detriment of that seller; where it knows that Western Farm Management hasn't even showed up at the closing as it hadn't in March of 1980, Connecticut General cannot receive the benefits of the transaction because it is too significant a participant with him to breach the fiduciary duty unless it speaks up."
 
 
 31
 The judgment of the district court is reversed and the case is remanded with directions to reinstate the priorities established by the bankruptcy court.