ANDALEX RESOURCES, INC., a Delaware corporation; and Amca Coal Leasing, Inc., a Delaware corporation; Malapai Resources Company, an Arizona corporation; Pacific Diversified Capital Company, a California corporation; New Albion Resources Company; and Mono Power Company, a California corporation, Plaintiffs and Appellees,

v.

Richard B. MYERS; Myers, Inc., a Kentucky corporation; and Myers & Company, a partnership consisting of Richard B. Myers, Betty Sue Myers, Cecelia Myers Baugh, Jane Myers Baggett, and Carolyn W. Hunt, Defendants and Appellants.

No. 920876–CA.

Court of Appeals of Utah.

March 18, 1994.

Craig G. Adamson and Eric P. Lee, Salt Lake City, for defendants-appellants.

John A. Snow and Kathryn H. Snedaker, Salt Lake City, for plaintiffs-appellees.

Before DAVIS and JACKSON, JJ., and GARFF,[1] Senior Judge.

## OPINION

JACKSON, Judge:

Richard B. Myers appeals the trial court's grant of appellees' motions for summary judgment and the denial of Myers' motion to amend his counterclaim. We affirm.

## FACTS

Malapai Resources, Inc., Pacific Diversified Capital Company, and Mono Power Company (Power Companies) were joint owners of coal leases granted by the United States and the state of Utah. The leases concerned approximately 47,000 acres of property in Kane County, Utah. In early 1979, the Power Companies entered into an agreement with Myers & Co. and Richard B. Myers (Myers), providing that Myers would act as a "finder" for the Power Companies in locating a coal mining company to produce coal from the leases or finding a sublessee, assignee or purchaser of the leases. Pursuant to the agreement Myers was to be compensated by the operator, sublessee, assignee or purchaser of the leases, not by the Power Companies.

Myers located W.R. Grace & Company (Grace), and after some negotiations, Grace and Myers entered into an option agreement with Malapai and Pacific, granting Grace and Myers an option to acquire their interests in the leases. On July 12, 1981, Grace agreed to compensate Myers for "his efforts in bringing the parties together," providing Grace exercised the options.[2]

Grace allowed the options to expire because of the depressed coal market and Grace's inability to locate a financial partner willing to share the risk. Myers asserts that Malapai and Pacific assured him orally that they would still transfer their interests in the leases to Grace if it elected to proceed.

---

1. Senior Judge Regnal W. Garff, acting pursuant to appointment under Utah Code Ann. § 78–3–24(10) (1992).

2. Myers characterizes this agreement as a joint venture agreement.

Myers contacted Andalex in 1982 and arranged for negotiations between Grace and Andalex regarding a joint venture for the development of the leases. In a meeting in August 1984, Myers asserts that Andalex orally agreed to compensate Myers by assuming the position of Grace under the agreement between Grace and Myers. Grace affirmed its decision not to purchase and develop the leases and Andalex began negotiating directly with the Power Companies for the purchase of the leases.

On September 10, 1985, Andalex entered into an agreement with the Power Companies to purchase the leases. Myers received no compensation from Andalex.

In July 1986, Andalex filed an action seeking a declaratory judgment that Myers was not entitled to recover any compensation from Andalex because such recovery was barred by the statute of frauds and the real estate broker licensing statutes.[3] Myers filed an answer and counterclaim against Andalex claiming breach of contract, quantum meruit, fraud, and negligent misrepresentation. Myers then filed a third-party complaint against the Power Companies asserting breach of an obligation of good faith and fair dealing.[4] In August 1991, Andalex filed a motion for partial summary judgment, which was granted by the trial court.

On May 23, 1991, Myers filed a motion for leave to file an amended counterclaim against Andalex, which was denied by the trial court. The Power Companies filed a motion for summary judgment in April, 1993 and Andalex filed a second motion for summary judgment on Myers' remaining claims. Both were granted by the trial court.

## ISSUES

Myers asserts the trial court improperly: (1) determined that Myers' breach of contract claims against Andalex should be dismissed because the Utah broker licensing laws barred his claim for compensation; (2) denied his motion to amend the counterclaim because the claim was also barred by Utah licensing laws; (3) dismissed his fraud claim against Andalex because Myers could not meet his burden of showing the intent element by clear and convincing evidence; and (4) dismissed his breach of the covenant of good faith and fair dealing claim against the Power Companies because the Power Companies did not have an express or implied obligation to assure that Andalex compensate Myers.

## ANALYSIS

### Contract and Quasi–Contract Claims

Myers claims that the trial court improperly determined that his contract claims for compensation were barred by Utah's broker licensing laws. An unlicensed person may not "bring or maintain an action in any court of this state" to receive compensation for services performed which are only authorized to be performed by a licensed principal broker. Utah Code Ann. § 61–2–18(1) (1993). A principal broker is defined as any person who, for valuable consideration or the expectation of consideration, "assists or directs [another] in the procurement of prospects for or the negotiation of" the sale or exchange of leaseholds involving real estate. Utah Code Ann. § 61–2–2(9), (10) (1993).

Myers implicitly agrees that the literal terms of these broker licensing statutes apply to his alleged agreement with Andalex and would bar his recovery of any compensation for his services. However, Myers asserts that the purpose of the statutes should prevail over their literal terms. Therefore, because the services he provided were not contemplated in the purpose of the licensing

---

3. In response to the complaint, Myers filed a motion to dismiss or stay the proceedings, seeking dismissal for lack of personal jurisdiction or, in the alternative, seeking a stay of the proceedings because of a pending Kentucky lawsuit involving identical parties and issues. The trial court denied the motion to dismiss and granted the motion to stay. The stay remained in effect until Myers filed his answer and counterclaim on July 22, 1988.

4. Pursuant to stipulation, the Power Companies were joined as plaintiffs with Andalex and the

statutes, they should not apply to him.[5]

■ We disagree with Myers' premise that the presumed purpose of a statute overrides its literal terms.[6] If the language of a statute is clear and unambiguous, we will not look beyond the language of the statute to make the language conform to a purpose not expressed. *West Valley City Corp. v. Salt Lake County,* 852 P.2d 1000, 1003 (Utah 1993). Here, there is no ambiguity. The language of the applicable statutes provide that (1) if a party brings an action in a Utah court, (2) for compensation, (3) for acts resulting in the sale or exchange of real estate, (4) he or she must have the requisite broker license in order to recover the commission. Utah Code Ann. §§ 61–2–4, 61–2–18 (1993).

■ In applying the unambiguous language of the statutes to the alleged agreement in our case, Myers' claims for breach of contract and quasi-contract are barred by the statutes. First, Myers clearly brought a counterclaim against Andalex in a Utah court. Second, the counterclaim sought compensation from Andalex. Third, the compensation was sought for acts performed by Myers that resulted in the sale or exchange of real property. The sale of the coal leases

constitutes a sale or exchange of real property. Utah Code Ann. § 61–2–2(10) (1993) ("real estate" includes leaseholds and business opportunities involving real property); *Chase v. Morgan,* 9 Utah 2d 125, 339 P.2d 1019, 1021 (1959) (oil and gas leases are real estate). Further, the acts performed by Myers that led to the sale of the leases fall within the definition of "assists or directs in the procurement of prospects for or the negotiation of" the sale or exchange of leaseholds involving real estate. Utah Code Ann. § 61–2–2(9)(d), (10). The language of the alleged agreement and Myers' own assertions show that Myers was to be compensated for bringing the parties together or acting as a "finder."[7] The act of finding or locating a prospective buyer falls within the reach of the broker licensing statutes. *Diversified,* 584 P.2d at 849–50.

Finally, Myers did not have a Utah broker's license when he acted as a finder. Thus, the trial court properly determined that the Utah broker licensing statutes barred his contract and quasi-contract claims for compensation.[8]

## Motion for Leave to Amend

■ Myers also asserts that the trial court improperly denied his motion to amend his

third-party complaint was deemed a counterclaim against the Power Companies.

5. Myers claims the purpose of the licensing provision is to protect "members of the public who rely on licensed real estate brokers and salesmen to perform tasks that require a high degree of honesty and integrity." *See Global Recreation, Inc. v. Cedar Hills Dev. Co.,* 614 P.2d 155, 158 (Utah 1980). He alleges that because he did not "list" or advertise the real estate to the general public, but rather approached sophisticated contacts in the coal industry as a finder, his actions do not fall under the "purpose of the licensing provision." Thus, he claims his actions should not be governed by the broker licensing statutes.

6. Even if we accept the argument that the purpose of the statute overrides the statute's unambiguous language, the services provided by Myers still fall within the purpose of the licensing statutes. The legislature clearly intended the licensing requirements to apply to "finders." *See Diversified Gen. Corp. v. White Barn Golf Course, Inc.,* 584 P.2d 848, 849–50 (Utah 1978). Further, nothing suggests that "sophisticated" corporate entities such as Andalex should not be entitled to the same protections as the general public under the statute.

7. The language of the Grace agreement that Myers asserts Andalex agreed to perform states that Myers "has made officials of [Andalex] aware of the availability of these coal interests" and "[Andalex] wishes to compensate Myers for the information." Moreover, Myers admits that he was to act as a "finder" and that the agreement was to compensate him "for his efforts in introducing Grace [or Andalex] to the opportunities presented by the coal leases." In his pleadings, Myers characterizes the agreement as providing "for certain compensation for Mr. Myers as a result of his efforts in bringing the parties together."

8. In oral argument, counsel for Myers asserted that the broker licensing statutes do not apply in this situation because Myers did not have a sufficient "nexus" with Utah. However, Utah Code Ann. § 61–2–18 (1993) provides that a person cannot "bring or maintain an action *in any court of this state* for the recovery of a commission" unless he or she is a principal broker. (Emphasis added). Myers chose to bring a counterclaim in a court of this state. He is not a principal broker in Utah. Thus, he cannot recover the commission under this "nexus" theory.

counterclaim. Myers was attempting to add a new cause of action based on breach of an alleged joint venture agreement between Myers and Andalex. The denial of a motion to amend a counterclaim is within the broad discretion of the trial court, and we will not disturb such a ruling absent an abuse of discretion. *Girard v. Appleby*, 660 P.2d 245, 248 (Utah 1983); *Mountain America Credit Union v. McClellan*, 854 P.2d 590, 592 (Utah App.), *cert. denied*, 862 P.2d 1356 (Utah 1993).

■ Rule 15(a), Utah Rules of Civil Procedure, permits a party to amend a counterclaim with leave of the court, and "leave shall be freely given when justice so requires." *See Timm v. Dewsnup*, 851 P.2d 1178, 1182 (Utah 1993). However, leave to file an amended complaint should be denied when the moving party seeks to assert a new claim that is legally insufficient or futile. *See Kasco Services Corp. v. Benson*, 831 P.2d 86, 92–93 (Utah 1992); *Black Canyon Racquetball Club, Inc. v. Idaho First Nat'l Bank*, 119 Idaho 171, 804 P.2d 900, 904 (1991).

■ Myers asserts that the joint venture agreement with Andalex was merely a claim to share profits, not an agreement requiring services of a licensed broker. Regardless of how Myers characterizes the alleged agreement, the substance of the agreement was to compensate Myers for his efforts in bringing the parties together. The new legal theory that Myers and Andalex had an agreement to operate as partners in a joint venture, thus giving Myers a share of the profits, attempts to recharacterize the agreement merely by attaching a new label to the relationship. Even if the compensation under the agreement allowed Myers a share of the profits, the nature of the services provided by Myers did not change. Thus, for the reasons discussed in the previous section, this "new" claim is legally insufficient and the trial court did not abuse its discretion in denying the motion for leave to amend.

### Fraud Claim

Myers alleges the trial court improperly dismissed his fraud claim against Andalex. Myers asserts in his counterclaim that Andalex fraudulently represented that it would compensate Myers in accordance with the terms of the alleged joint venture agreement between Grace and Myers. Myers argues that Robert Anderson, president of Andalex, promised to compensate Myers but had no intention of keeping his promise.

■ Myers must show the following elements to establish his fraud claim:

(1) a representation; (2) concerning a presently existing fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

*Dugan v. Jones*, 615 P.2d 1239, 1246 (Utah 1980).

■ In granting a motion for summary judgment, a trial judge must consider each element of the claim under the appropriate standard of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (a party must make a sufficient showing to establish the existence of all essential elements of a claim on which that party will bear the burden of proof at trial); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (a party must prove a claim with clear and convincing evidence at the summary judgment stage if that is the burden required at trial); *Robinson v. Intermountain Health Care*, 740 P.2d 262, 264 (Utah App.1987) (in evaluating whether summary judgment should be granted, we must take into consideration the eventual standard of proof for each element of the claim at trial on the merits). Fraud claims must be proven by clear and convincing evidence. *Applied Genetics, Int'l, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1243 (10th Cir.1990) (clear and convincing standard must be considered in determining whether motion for summary judgment should be granted on fraud claim); *see Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 800 (Utah

1991) (the elements of fraud must be proven by clear and convincing evidence); *Secor v. Knight,* 716 P.2d 790, 794 (Utah 1986); *Embassy Group v. Hatch,* 865 P.2d 1366, 1371 (Utah App.1993). Thus, Myers must be able to prove each element of fraud by clear and convincing evidence.

■ A misrepresentation of intended future performance is not a "presently existing fact" upon which a claim for fraud can be based unless a plaintiff can prove that the representor, at the time of the representation, did not intend to perform the promise and made the representation for the purpose of deceiving the promisee. *See Cerritos Trucking Co.·v. Utah Venture No. 1,* 645 P.2d 608, 611 (Utah 1982). The trial court found that even assuming Andalex promised to compensate Myers, Myers failed to demonstrate by clear and convincing evidence that Anderson did not intend to compensate Myers when he allegedly promised to do so.

The only evidence Myers presented concerning Anderson's intent is as follows: (1) Andalex has always denied that Anderson made a promise on its behalf to compensate Myers; (2) after.being introduced to the project by Myers and working with Myers and Grace for many months, Andalex "suddenly excluded Grace and Myers from its negotiations with the Power Companies and eventually consummated its own agreement;" and (3) Keith Smith, a senior officer at Andalex never heard anything from Anderson regarding the promise and Smith would have heard of the promise had Anderson intended that Andalex would compensate Myers.

■ Myers asserts that the intent to deceive may be inferred from the above circumstantial evidence. While the intent to deceive may be inferred, *Galloway v. AFCO Dev. Corp.,* 777 P.2d 506, 509 (Utah App. 1989), it must be established by more than doubtful, vague, speculative or inconclusive evidence. *See Walker v. Carlson,* 740 P.2d 1372, 1374 (Utah App.1987).

■ Myers' assertions, without more, are inadequate to establish by clear and convincing evidence that Anderson did not intend to perform the alleged promise at the time it was made or that the alleged misrepresenta-

tions were made for the purpose of deceiving Myers. Indeed, Myers' own testimony suggests that Anderson did not intend to deceive Myers regarding compensation. Mr. Myers stated: "I think the only thing that they did that was deceiving to us was to go around. Grace prior to telling us that they were going to do it. I don't think Mr. Anderson was attempting to deceive us. He was just like he always was, straight upfront."

Accordingly, we affirm the trial court's dismissal of Myers' fraud claim because Myers has failed to demonstrate clear and convincing evidence that could support a verdict for him at trial.

### Covenant of Good Faith and Fair Dealing Claim

Myers alleges the trial court improperly dismissed his claims against the Power Companies for breach of the constructive covenant of good faith and fair dealing. Specifically, Myers asserts that the agreement between Myers and the Power Companies required the Power Companies to insure that a purchaser of the leases compensate Myers. He maintains that the Power Companies breached their covenant to act in good faith by failing to "insist that Andalex properly compensate Myers for his work." Myers asserts that "their implied obligation was to only contract with Andalex if Andalex provided assurances, as Grace did, that Myers would be compensated."

■ The covenant of good faith and fair dealing inheres in most, if not all, contractual relationships. *St. Benedict's Dev. v. St. Benedict's Hospital,* 811 P.2d 194, 199 (Utah 1991). Under this covenant, the parties promise that they will not intentionally or purposely do anything that will destroy or injure the other party's right to receive the fruits of the contract. *Id.* To comply with the obligation to perform a contract in good faith, the party's actions must be consistent with the agreed common purpose and justified expectations of the other party. *Id.* at 200; Restatement (Second) of Contracts § 205 comment a (1981). "The purpose, intentions, and expectations·of the parties should be determined by considering the con-

tract language *and* the course of dealings between and conduct of the parties." *St. Benedict's,* 811 P.2d at 200. However, the covenant of good faith and fair dealing cannot be construed to establish new, independent rights or duties not agreed upon by the parties. *Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 55 (Utah 1991).

 In this case, the contract language, consisting of a collection of letter agreements, fails to establish that Myers had a justified expectation that the Power Companies would insure his compensation from Andalex. Myers states in his letter dated May 23, 1981, that "[m]y intent is to receive any compensation for sub-lease of coal from the producer of the coal." Further, the Power Companies' letter dated March 18, 1981 states:

> Insofar as compensation is concerned, you initially established in your May 23, 1979 letter to our group, that you would seek any compensation for your efforts from the purchaser, and we agreed to allow you to present qualified purchasers on that basis. It is not our desire to depart from that position in any way with respect to your continued activities.

Again, in a letter from Mono Power to Myers dated March 24, 1981, Mono stated: "It also follows that we are in agreement that any compensation to which you may be entitled for finding a buyer for Mono Powers' interest must be arranged with such buyer by you and not by us." Similarly, in a May 5, 1990 letter from Pacific Power to Myers, Pacific stated: "I would like to reiterate our agreement that any compensation to you for your efforts will have to be worked out between you and interested parties other than [Malapai], Mono Power, and [Pacific]." Additionally, Myers testified that the letters accurately reflected his understanding of his agreement with the Power Companies. The express language of the letters does not suggest the parties expected the Power Companies to see that Myers received compensation for his efforts.

The course of dealings also fails to establish that the Power Companies had a good faith obligation to insure that Myers be compensated. In fact, the course of dealings and conduct of the parties actually show that Myers did not have any such justifiable expectation. The Power Companies instructed Myers to contract with the sub-lessees directly in order to receive compensation. Accordingly, Myers entered into an elaborate compensation agreement with Grace.[9] Myers should have entered into a similar written agreement with Andalex. He did not.

Further, at a meeting on March 28, 1985, between the Power Companies and Andalex, in the presence of Myers and his attorney, Andalex made clear its understanding that it had no agreement to compensate Myers. Myers made no claim to the contrary at the meeting. The obligation of good faith and fair dealing does not create a new, independent duty upon Andalex to insure that Myers receive compensation when the parties had no such agreement and Myers had no justifiable expectation of such a duty. *See Brehany,* 812 P.2d at 55. Accordingly, we affirm the trial court's dismissal of Myers' breach of the covenant of good faith and fair dealing claim because the Power Companies did not have an express or implied duty to assure that Andalex compensate Myers.

## CONCLUSION

The trial court properly granted summary judgment on Myers' contract claims for compensation because they were barred by Utah's broker licensing statutes. The trial court did not abuse its discretion in denying Myers' motion to amend his counterclaim because his "joint venture" claim was also

---

9. Myers asserts that the compensation agreement between Grace and Myers came about at the insistence of the Power Companies. He claims this created a justified expectation that the Power Companies would insure compensation from An-

dalex. However, these assertions are not adequately supported by the record, and even if they were, would not be enough to create a justified expectation that the Power Companies would insure compensation.

barred by the licensing statutes. Further, the trial court properly dismissed Myers' fraud claim because Myers could not meet his burden of showing the intent to defraud by clear and convincing evidence. The trial court also properly determined the Power Companies did not breach their covenant of good faith and fair dealing. Accordingly, we affirm.

DAVIS, J., and GARFF, Senior Judge, concur.