The **REPUBLIC GROUP, INC.,** a
Utah corporation, Plaintiff
and Appellant,

v.

**WON–DOOR CORPORATION,** a Utah corporation; Jay A. Smart; Ron Smart; Reed A. Watkins; and Does 1 through 20, Defendants and Appellees.

No. 920330–CA.

Court of Appeals of Utah.

Sept. 7, 1994.

Rehearing Denied Nov. 7, 1994.

Richard K. Crandall (argued) and Robert G. Norton, Salt Lake City, for appellant.

Jeffrey M. Jones, Paul M. Durham, Durham, Evans & Jones, and Richard A. Rappaport (argued), Cohne, Rappaport & Segal, P.C., Salt Lake City, for appellees.

Before BENCH, DAVIS and JACKSON, JJ.

## OPINION

JACKSON, Judge:

The Republic Group, Inc. (Republic) appeals the trial court's order granting summary judgment in favor of the defendants, Won–Door Corporation (Won–Door), Reed Watkins, Jay Smart, and Ron Smart. We reverse the summary judgment with respect to Republic's claims for breach of the covenant of good faith and fair dealing, actual fraud, and breach of contract. We affirm the summary judgment with respect to Republic's claim for constructive fraud. Accordingly, we remand for further proceedings.

## FACTS

In February 1986, Watkins, acting as agent for Won–Door, contacted Republic through its president, Irvin Bird, a long-standing friend and business associate of Watkins. Won–Door and its shareholders, including Jay and Ron Smart, expressly authorized Watkins to act as their agent in enacting Won–Door's "plan to raise funding through ... a private placement of common stock." Watkins sought to engage Republic's services on behalf of Won–Door for the purpose of locating funding for the proposed private placement transaction.

Shortly thereafter, Watkins and Bird negotiated an agreement between the two companies which was memorialized in a letter dated March 12, 1986 (March 12 agreement). Pursuant to the agreement, Republic would receive a commission of $250,000 if Republic, through its contacts, funded a private placement of 176,000 shares (22 percent of the shares outstanding) of Won–Door stock in the amount of $7,392,000.

Republic immediately began introducing the Won–Door proposal to business contacts thought to be willing and able to fund the private placement. After some weeks, Republic informed Watkins that it had become apparent that there was little or no interest in purchasing a minority position in Won–Door, a closely-held family corporation.

As a result, Watkins authorized Republic to contact potential purchasers for all of Won–Door's outstanding stock. Bird and the other representatives of Republic claim that the parties agreed that a sale price of the Won–Door stock would be in the range of $32 to $35 million and that Won–Door would pay Republic a reasonable fee if one of its contacts actually funded the transaction.

By mid-May 1986, Republic had contacted twenty to thirty different companies for the purpose of procuring a purchaser of the Won–Door stock. Among the companies contacted through Republic at this time were Thermal Systems, Inc., a wholly owned subsidiary of TS Industries (TSI), and Leucadia National Corporation (Leucadia). During this time, Watkins had been in almost daily contact with Republic, encouraging the marketing efforts and seeking information about these potential buyers. About this time, Bird warned Watkins that Thermal Systems was a "poor" company with which to do business.

On April 28, 1986, Watkins, in his capacity as Won–Door's agent and without Republic's knowledge, contracted with Boettcher & Company (Boettcher), naming it the exclusive sales agent for the sale of the Won–Door stock with the exception of ten companies previously contacted. Apparently in an effort to conform to the Boettcher agreement, Watkins contacted Republic, requesting a list

of ten Republic contacts to be listed as the exclusions to the Boettcher agreement.

Republic informed Watkins that it had introduced the Won–Door proposal to significantly more than ten companies and protested efforts to bind Republic to ten contacts. On May 21, 1986, Republic submitted to Watkins a list of eleven companies, including Republic, as "formal notice" of potential buyers. On May 27, 1986, Republic submitted another list of fifteen contacts as potential purchasers. The May 21 list included Leucadia, and the May 27 list included Thermal Systems, Inc. Republic's representatives claim that the Boettcher agreement was not binding on Republic and that Republic never agreed at this time to be limited to any list of ten contacts.

The parties experienced several disagreements from May 1986 through August 1986. During this time Republic frequently requested that Watkins clarify a new fee arrangement regarding the sale of 100 percent of Won–Door's stock and reduce it to writing. Watkins made several representations concerning how much the new finder's fee would or should be. Nevertheless, Watkins delayed finalizing a concrete agreement as to the fee amount, telling Bird to trust him and that Republic would get its fee. Despite these disputes, Republic continued to work with its existing contacts and to contact other potential purchasers in Won–Door's behalf.

As early as July 1986, representatives of TSI approached Watkins and entered into negotiations for the purchase of Won–Door. However, Republic was unaware of these negotiations.

In August 1986, Leucadia made an offer to purchase Won–Door for $35 million. When representatives of Leucadia informed Republic of Leucadia's impending offer, Republic's attorney, Douglas Parry, contacted Watkins to demand a written fee agreement on behalf of Republic. Watkins met with Bird and another officer from Republic on August 22, 1986. At this meeting, Bird repeatedly asked Watkins if he was dealing with any other companies contacted by Republic besides Leucadia. Watkins indicated that he was dealing with one other company, but represented to Bird that it was not a compa-

ny contacted by Republic and, therefore, none of Republic's business.

In reliance upon these representations, Republic's representatives agreed to sign an agreement drafted by Watkins (August 22 agreement), providing for a substantial fee to Republic if "Leucadia (or any of the other qualified ten listed companies)" purchased Won–Door. The document also provided that Republic would receive a half fee if the deal was consummated through James Volker or a $5,000 default fee if Won–Door was sold to someone else.

On October 27, 1986, TSI purchased all of the outstanding shares of Won–Door stock. Republic asked for its fee, and Won–Door refused, offering only the $5,000 default fee. Republic brought suit against Won–Door, its shareholders, and Watkins. The defendants filed a motion for summary judgment on all claims, and Republic filed a motion for partial summary judgment. The trial court granted the defendants' motion and denied Republic's motion. Republic appeals.

### ISSUES

Republic asserts that the trial court improperly granted summary judgment in favor of the defendants on Republic's claims of (1) breach of the covenant of good faith and fair dealing, (2) actual and constructive fraud, and (3) breach of contract.

### STANDARD OF REVIEW

■ Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Western Farm Credit Bank v. Pratt*, 860 P.2d 376, 377 (Utah App.1993), *cert. denied*, 879 P.2d 266 (Utah 1994). "We accord no deference to the trial court's conclusion that the facts are not in dispute nor the court's legal conclusions based on those facts." *Western Farm Credit*, 860 P.2d at 378 (quoting *Kitchen v. Cal Gas Co.*, 821 P.2d 458, 460 (Utah App.1991), *cert. denied*, 832 P.2d 476 (Utah 1992)). Furthermore, in reviewing a summary judgment, we will view the facts, including all inferences arising

from those facts, in a light most favorable to the party opposing the motion and will allow the summary judgment to stand only if the movant is entitled to judgment as a matter of law on the undisputed facts. *Chapman v. Primary Children's Hosp.*, 784 P.2d 1181, 1182–83 (Utah 1989); *Western Farm Credit*, 860 P.2d at 378.

■ In addition, when granting a motion for summary judgment, a trial judge must consider each element of the claim under the appropriate standard of proof. *Andalex Resources, Inc. v. Myers*, 871 P.2d 1041, 1046 (Utah App.1994). Accordingly, in evaluating whether summary judgment should be granted, we must take into consideration the eventual standard of proof for each element at trial on the merits. *Robinson v. Intermountain Health Care*, 740 P.2d 262, 264 (Utah App.1987).

## ANALYSIS

### I. March 12 Agreement

In order to grant or deny summary judgment on Republic's claim for breach of the covenant of good faith and fair dealing, the trial court first needed to determine the status of the parties' March 12 agreement. Republic alleges that Watkins, acting as agent for the other defendants, breached the covenant of good faith and fair dealing connected with a modified March 12 agreement while negotiating the August 22 agreement by (1) failing to disclose the contacts with TSI, (2) affirmatively representing to Republic that he was not dealing with any of Republic's contacts besides Leucadia, and (3) thereby procuring TSI's deletion from the new fee arrangement.

Won–Door, on the other hand, contends that the March 12 agreement had expired, the parties had not modified that contract, and no other contract was in effect until the August 22 agreement.[1] Accordingly, Won–

Door claims it owed no duty of good faith and fair dealing to Republic.

### A. Effect of Parties' Conduct on March 12 Agreement

■ If the trial court could determine as a matter of law on the undisputed facts that the parties had, orally or by conduct, rescinded or otherwise terminated the March 12 agreement without entering into a new agreement, then no contract was in place and no covenant of good faith and fair dealing existed at the time of the alleged breach. If, on the other hand, the facts could support a finding that the parties either modified the March 12 agreement or terminated the March 12 agreement and entered into a new one, then a covenant of good faith and fair dealing may have been in effect. If a covenant did exist, the trial court erred in granting summary judgment in favor of the defendants on this claim unless the trial court could conclude as a matter of law that no conduct of Won–Door or Watkins breached the covenant.

■ "The covenant of good faith and fair dealing inheres in most, if not all, contractual relationships." *Andalex Resources, Inc. v. Myers*, 871 P.2d 1041, 1047 (Utah App.1994) (citing *St. Benedict's Dev. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991)). To comply with the obligation to act in good faith and deal fairly, a party must act consistently with the contract's agreed common purpose and the other party's justified expectations, also arising from the contract between the parties. *See St. Benedict's*, 811 P.2d at 200. Accordingly, to find a breach of the covenant of good faith and fair dealing, "there must be some type of preexisting contractual relationship." *Andreini v. Hultgren*, 860 P.2d 916, 921 (Utah 1993).

The trial court apparently found, as a matter of law, that no contractual relationship was in existence at the time of the alleged breach in the instant case.[2] However, the

---

1. Won–Door argues, rather incongruously, that because the March 12 agreement became "obsolete" in April, the parties had no binding contract until August 22; yet, Won–Door also claims that Republic was contractually bound on May 21 to limit its fee arrangement to just ten named contacts.

2. The trial court failed to indicate, apart from a few comments made at the hearing, which facts and legal rationale it relied upon in support of its order granting the defendants' motion for summary judgment. We are left to infer the trial court's reasoning in this matter.

undisputed facts do not support such a conclusion.

Won–Door claims that the March 12 agreement somehow "expired" or "terminated" when the parties realized the impracticability of trying to find a buyer for only 22 percent of the stock. Won–Door supports this contention with Bird's deposition testimony that "this document [March 12 agreement] became very obsolete," and with the fact that the parties began to look for buyers of the entire company and not just 22 percent.

Nevertheless, the March 12 agreement did not on its face establish conditions for the termination of the contract except when the contract has been completely performed. Because 22 percent of Won–Door stock had not yet been sold, on its face the March 12 agreement had not expired. Furthermore, no undisputed facts adequately support a conclusion that the agreement had been mutually rescinded, or if it had been rescinded or otherwise terminated, that a new contract had not been entered into by the parties prior to the August 22 agreement.

When we view the facts in a light most favorable to Republic, we find evidence that could support a factual finding that the March 12 agreement had simply been modified. According to the verified complaint and affidavits of several of Republic's officers, Watkins agreed that Republic should seek out buyers for all of the Won–Door stock at a price between $32 to $35 million instead of buyers for only 22 percent at a price of nearly $7.4 million. Also, evidence was presented that the parties agreed that Republic would receive a fair or reasonable fee in light of prior agreements. Apart from modifying the terms of the stock purchase and the finder's fee to Republic, the evidence could support a finding that the other terms and conditions of the March 12 agreement remained in place.[3] This is especially true in light of the fact that a sale of all outstanding shares is consistent with Won–Door's stated objective in the March 12 agreement of "becom[ing] a public company within a five year period."

Even so, whether the existing contract was simply modified or whether a new contract was entered into is irrelevant as long as evidence could support a finding that a contract between the parties existed at the time of the alleged breach of the covenant of good faith and fair dealing. The evidence could support such a finding. In addition to the evidence already mentioned, the continued dealings of the parties in efforts to find a buyer of Won–Door stock support a conclusion that the parties had an agreement. Won–Door even quotes Bird's deposition testimony that "it was determined that Won–Door would entertain a sale for the entire corporation." Additionally, Watkins affirmatively sought to limit Republic to just ten contacts, suggesting that a contract existed at least with respect to ten contacts.

The Utah Supreme Court has adopted the position that:

> [A] substituted contract, whether of rescission or modification, may be expressed otherwise than in words. Such an implied, or inferred, agreement, found by the interpretation of conduct instead of words, has the same legal operation as if it had been expressed in words.

*Robison v. Hansen*, 594 P.2d 867, 870 (Utah 1979) (quoting 6 Corbin on Contracts § 1293, at 197). The conduct of the parties in this case could support a finding that the parties had an ongoing contract.

Won–Door asserts that, as a matter of law, there was no meeting of the minds as to the fee and, hence, to the whole contract. In support of its assertion, Won–Door points out that the evidence provided by Republic only indicates that the parties agreed a "reasonable" fee would be paid and that Bird admitted in deposition: "There was never an agreement definitely as to what the fee agreement was." Won–Door then relies on *Pingree v. Continental Group of Utah, Inc.*, 558 P.2d 1317 (Utah 1976), in support of its legal argument that the parties never came

---

**3.** The March 12 agreement also provided that Republic would, through its contacts, seek to fund the stock purchase, that Republic would bear its own costs, and that Republic should submit the names of its contacts to have their status qualified in advance.

to a meeting of the minds.[4] However, the present situation is distinguishable from the one in *Pingree*, where the trial court erred in inferring a "reasonable" rent. In *Pingree*, the trial court interpreted the contract terms as *implying* a reasonable rent. *Id.* at 1321. Here, the evidence, when viewed in the light most favorable to Republic, could support a finding that a "reasonable" fee is what the parties actually agreed to, and that the exact dollar amount would be settled in the future.[5]

Also, the contract in *Pingree* was setting the criterion for determining the rent five years in the future, *id.* at 1320, when the parties likely had little idea what a reasonable rent might be. In our case, the parties had already agreed that $250,000 would be an appropriate fee if 22 percent of Won–Door stock was sold. A little more than five months later, the parties finally agreed to a scheme whereby Republic would have received $450,000 if all Won–Door stock was sold to an appropriate party for $35 million. Accordingly, the determination of a reasonable fee would neither conflict with express contract terms nor be extremely difficult to accomplish. Thus we find genuine issues of material fact which must be resolved to determine whether a contract was in place, and if so, what the terms of the agreement were at the time of the alleged breach of the covenant of good faith and fair dealing.

### B. Breach of Covenant of Good Faith Claim

<span style="background:black"></span> Under the covenant of good faith and fair dealing, the parties constructively promise that they will not intentionally or purposely do anything to destroy or injure the other party's right to receive the fruits of the contract. *St. Benedict's,* 811 P.2d at 199; *Andalex,* 871 P.2d at 1047. Compliance with this covenant or duty depends upon the agreed common purpose and justified expectations of the parties. *St. Benedict's,* 811 P.2d at 200; *Andalex,* 871 P.2d at 1047. Because these should be determined by considering the contract language, the conduct of the parties, and the course of dealings between them, exactly what obligations Won–Door and Watkins may have owed as part of this covenant depends largely upon the contract in existence at the time. *See St. Benedict's,* 811 P.2d at 199–200; *Andalex,* 871 P.2d at 1047–48.[6] Because existence of a contract is in dispute, whether a covenant of good faith and fair dealing has been breached is also necessarily in dispute. Furthermore, good faith and fair dealing are fact sensitive concepts, and whether there has been a breach of good faith and fair dealing is a factual issue, generally inappropriate for decision as a matter of law. *Western Farm Credit Bank v. Pratt,* 860 P.2d 376, 380 (Utah App.1993).

Accordingly, we hold that genuine issues of material fact exist with regard to Republic's claim for breach of the covenant of good faith and fair dealing and that the trial court erred in granting summary judgment on this claim.

### II. August 22 Agreement

Next, the trial court needed to determine what effect the August 22 agreement had on any prior existing contracts (i.e., a modified

---

4. In *Pingree*, the parties disputed the amount of rent which should be charged upon renewal of a lease. The option to renew expressly provided that tax increases, increases or decreases in costs of business, business volume and success, insurance costs and other reasonable allowances would be the factors considered in renegotiating a monthly rental. *Id.* at 1320. The Utah Supreme Court reversed the trial court's determination that the parties intended a "reasonable" rent, stating that the lower court's "*interpretation* [of the option to renew] had the effect of nullifying the express factors specified by the parties, and substituting a new agreement to which the parties had not committed themselves." *Id.* at 1321 (emphasis added). Because the lower court's interpretation that a reasonable rent was intended was not supported by the terms of the agreement, the supreme court concluded that the option to renew was "too vague and indefinite [thereby evidencing no meeting of the minds] to be enforceable." *Id.*

5. The Utah Supreme Court has held that "[t]he fact that part of the performance is that the parties will enter into a contract in the future does not render the original agreement any less binding." *Bunnell v. Bills,* 13 Utah 2d 83, 87, 368 P.2d 597, 600 (Utah 1962) (*quoted in Buehner Block Co. v. UWC Assocs.,* 752 P.2d 892, 897 (Utah 1988)).

6. Indeed, "the covenant of good faith and fair dealing cannot be construed to establish new, independent rights or duties not agreed upon by the parties." *Andalex,* 871 P.2d at 1048.

March 12 agreement). This effect depends in part on whether Watkins induced Republic to enter into the August 22 agreement through fraud. It also depends on whether the August 22 agreement represented a valid contract or whether it was void for vagueness or for lack of meeting of the minds.

### A. Fraud Claims

■ If Watkins committed fraud to induce Republic to enter into the August 22 agreement, the August 22 agreement is voidable. *See Baldwin v. Burton,* 850 P.2d 1188, 1193 (Utah 1993). Furthermore, Republic would be entitled to damages from Watkins and Won–Door for fraud and possibly for breach of any prior existing contract which the August 22 agreement would fail to cancel or modify. In order to grant summary judgment on this claim, the trial court had to determine that Republic failed to supply evidence which, if accepted as true, would clearly and convincingly support each element of a fraud claim.

Republic argues that Watkins committed actual fraud in making representations that Republic needed no written agreement, that Bird should trust Watkins to see that Republic would get its fee, and that the "other" company with whom Watkins was dealing was not a contact of Republic. Republic also claims that Watkins committed constructive fraud because Watkins was in a confidential relationship with Bird, requiring Watkins to disclose the contact from and negotiations with TSI.

We first consider whether the trial court correctly granted summary judgment with respect to the claim of actual fraud. Because the elements of fraud must be proven by clear and convincing evidence, we must consider this standard in determining whether the trial court should have granted summary judgment on this claim. *Andalex Resources, Inc. v. Myers,* 871 P.2d 1041, 1046–47 (Utah App.1994). Accordingly, Republic must have provided evidence which, if accepted by the trier of fact as true, would meet the clear and convincing standard required to establish a fraud claim.

The required elements of actual fraud include the following:

(1) a representation; (2) concerning a presently existing fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

*Dugan v. Jones,* 615 P.2d 1239, 1246 (Utah 1980); *accord Andalex,* 871 P.2d at 1046.

■ Republic provided evidence that Watkins indeed represented that Republic did not need a written agreement and that Bird should trust Watkins to see that Republic would get its fee. However, a misrepresentation of intended future performance is not a representation concerning a "presently existing fact" upon which a claim for fraud can be based unless Republic can prove that Watkins, at the time of the representation, did not intend to perform the promise and made the representation for the purpose of deceiving Republic. *See Cerritos Trucking Co. v. Utah Venture No. 1,* 645 P.2d 608, 611 (Utah 1982); *Andalex,* 871 P.2d at 1047. Republic has provided no evidence which could prove, clearly and convincingly, that Watkins's intent was to deceive Republic when he made these representations. Accordingly, a claim for fraud cannot be made on these representations.

On the other hand, Republic, through affidavits and deposition testimony, has provided evidence that Watkins affirmatively represented to Republic's officers on August 22 that Watkins was then dealing with Leucadia and another undisclosed company that Republic had not contacted. If the evidence concerning this representation is accepted as true, this was clearly a representation concerning a presently existing fact. Watkins was, in fact, dealing with TSI.

If Republic's evidence is further accepted, then (1) Thermal Systems, Inc. is essentially the same company as TSI, (2) Thermal Systems was originally contacted by Republic, and (3) Watkins knew these facts. In this

light, Watkins made a false representation of a material fact, knowing it to be false when he made it. In addition, Republic's evidence could support a finding that this representation was made to induce Republic's officers to sign the August 22 agreement without seeking to include TSI in the fee arrangement,[7] and that Republic's officers reasonably relied upon this representation in signing the August 22 agreement, thereby excluding TSI from the group of contacts through which Republic could receive the maximum fee.[8] Finally, loss of the fee supplies the damage element of the fraud claim.

Accordingly, we conclude that genuine issues of material fact exist with regard to Republic's claim for actual fraud and that Republic has provided clear and convincing evidence, if accepted by the trier of fact as true, to support a claim for fraud. The trial court erred in granting summary judgment against Republic on this claim.

■ However, we find Republic's claim of constructive fraud to be without merit.[9] The

trial court was correct in granting summary judgment on the claim of constructive fraud.[10]

### B. Validity of August 22 Agreement and Effect on Breach of Prior Contract Claim

■ In addition to considering the fraud claim, the trial court needed to determine that, based on the undisputed facts, the August 22 agreement represented a valid and enforceable contract as a matter of law. If so, the August 22 agreement replaced any prior existing contracts, and the trial court properly granted summary judgment on Republic's claim for breach of any such contract by Won–Door.

Republic claims to have performed all obligations, evidently completed upon the sale of Won–Door to TSI, under a contract existing from March 12, 1986 through October 27, 1986. Republic argues that this performance

---

7. This intent to deceive Republic into acting may be inferred from the evidence. *See Andalex,* 871 P.2d at 1047. This inference is bolstered by evidence that Watkins wanted no other attorney present during the negotiation and execution of the August 22 agreement, that Won–Door would likely have to pay a substantial fee to both Republic and Boettcher if TSI were included in the August 22 agreement, and that Watkins had a personal financial interest in the sale of Won–Door.

8. Won–Door claims Watkins had a duty to *not* disclose TSI because such disclosure would somehow breach the Boettcher agreement. Even so, this would not justify Watkins's *false* statement that the "other" company was not one of Republic's contacts. In any event, the evidence seems to contradict the notion that the August 22 agreement would have any effect on the Boettcher agreement.

 Won–Door claims that, by virtue of the Boettcher agreement, Republic was bound to only ten contacts on May 21, when it provided that first list. However, it appears that no list was attached to the Boettcher agreement or delivered to Boettcher. And even if Boettcher could receive a fee for the sale of stock to TSI, since TSI was not on the May 21 list of supposed exclusions, that fact apparently did not prevent Watkins from adding James Volker, also not on the May 21 list, to the August 22 agreement with Republic. In fact, this could be viewed as further evidence of Watkins's desire to exclude TSI from the August 22 agreement so as to avoid

possibly paying a fee to both Republic and Boettcher, as Won–Door apparently would have had to do if Volker funded the purchase.

9. Republic claims that Watkins was in a confidential relationship with Bird, which required Watkins to disclose the contact from and negotiations with TSI. "A confidential relationship arises when one party, having gained the trust and confidence of another exercises extraordinary influence over the other party." *Von Hake v. Thomas,* 705 P.2d 766, 769 (Utah 1985). Furthermore, "[t]he doctrine of confidential relationship rests upon the principle of inequality between the parties, and implies a position of superiority occupied by one of the parties over the other." *Bradbury v. Rasmussen,* 16 Utah 2d 378, 383, 401 P.2d 710, 713 (Utah 1965). Neither Bird nor Republic can claim, under the evidence presented, that Watkins exercised "extraordinary" influence over either of them. Watkins could not occupy a position of clear superiority and inequality over Bird or Bird's company, Republic. "Mere confidence in one person by another is not sufficient alone to constitute such a relationship." *Id.* The fact of Bird's long-standing friendship and business association with Watkins is not enough to impose an independent duty on Watkins to disclose his dealings with TSI so as to avoid taking advantage of Republic.

10. We do not determine whether Watkins had an affirmative duty to disclose his dealings with TSI as part of a constructive covenant of good faith and fair dealing.

entitled it to a reasonable fee under its agreement with Won–Door.

However, Republic entered into a new agreement with Won–Door on August 22, 1986. "Ordinarily, a final contract does represent the final meeting of the minds.... If there are inconsistencies between the terms of the preliminary and final contracts, those of the latter will ordinarily govern." *Mawhinney v. Jensen*, 120 Utah 142, 150, 232 P.2d 769, 774 (Utah 1951). Under the August 22 agreement, Republic is only entitled to the maximum fee if TSI was included in the "other qualified ten listed companies" as termed in the agreement. Republic has presented no evidence that could support a finding that TSI was included among these ten companies. In fact, the evidence presented on this issue would seem to support a finding that TSI was not included. Accordingly, Won–Door could not have breached the August 22 agreement.

To counter this argument, Republic argues that the August 22 agreement is void for vagueness, indicating that there was never a meeting of the minds between the parties. Republic asserts that because the August 22 agreement is void, that agreement did not replace any prior existing contract, which contract Won–Door did breach.

■ A meeting of the minds is essential to the formation of any contract, *see Pingree v. Continental Group of Utah, Inc.*, 558 P.2d 1317, 1321 (Utah 1976), and this meeting of the minds must be spelled out, either expressly or implicitly, with sufficient detail to be enforced. *Id.*

■ The interpretation of a written contract is first a question of law determined by the words in the agreement. *See Saunders v. Sharp*, 806 P.2d 198, 200 (Utah 1991) (interpretation of a contract is a matter of law unless the court must resort to extrinsic evidence of the parties' intent); *Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988) (interpretation of a written contract is a question of law if determined by the words of the agreement); *Big Butte Ranch, Inc. v. Holm*, 570 P.2d 690, 691 (Utah 1977) (to ascertain the meaning of a contract, the court should first examine the language of the instrument). In construing such a contract, the trial court must give effect to the intentions of the parties, and if possible, these intentions should be gleaned from an examination of the text of the contract itself. *Buehner Block Co.*, 752 P.2d at 895; *Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225, 229 (Utah 1987). Accordingly, whether an ambiguity exists is also a question of law to be decided by the trial court before considering extrinsic evidence. *See Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983).

■ The trial court concluded that the August 22 agreement was clear and unambiguous, indicating at the hearing that:

> It is clear [the August 22 agreement] is setting [the fee amount] only as to those ten contacts. And based on the *other* evidence, I think it is pretty clear that those ten contacts, when the list was supplied in April [sic], were intended to be the ones that would entitle Republic [to] a fee.

(Emphasis added.) However, the trial court's holding was not based on the wording of the document alone. The express language of the August 22 agreement provided that Republic would receive the full fee if "Leucadia (or any of the other qualified ten listed companies)" purchased Won–Door. Without considering extrinsic evidence, the court could not know who the "qualified ten listed companies" were. As a matter of law, we find the contract to be ambiguous on its face.

■ When the meaning of written contract is ambiguous or uncertain, then extrinsic evidence of the parties' intentions should be considered. *See Big Butte Ranch*, 570 P.2d at 691. When contract interpretation will be determined by extrinsic evidence of intent, it becomes a question of fact. *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 90 (Utah 1988) (citing *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985)). Because the parties here dispute which companies were intended as the "qualified ten listed companies," the trial court's interpretation that the May 21 letter supplied the list was improper on a motion for summary judgment.

We conclude that genuine issues of material fact exist with respect to what companies the parties intended to include in the August 22 agreement. Accordingly, the trial court could not find a meeting of the minds as a matter of law. Further, the trial court could not then determine that no prior contract had been breached in October by virtue of the August 22 agreement having effect. Thus we conclude that the trial court erred in granting summary judgment on Republic's claim for breach of a contract existing prior to August 22.

## CONCLUSION

We reverse the summary judgment with respect to Republic's claims for breach of the covenant of good faith and fair dealing, actual fraud, and breach of contract. We affirm the summary judgment with respect to Republic's claim for constructive fraud. Accordingly, we remand for further proceedings.

BENCH and DAVIS, JJ., concur.