## 2019 UT App 68

## THE UTAH COURT OF APPEALS

JODIE K. LEVITT,
Appellant,
*v.*
IASIS HEALTHCARE HOLDINGS INC., SALT LAKE REGIONAL MEDICAL
CENTER LP, ALAN DAVIS, AND WANDA UPDIKE,
Appellees.

Opinion
No. 20180260-CA
Filed May 2, 2019

Third District Court, Salt Lake Department
The Honorable Andrew H. Stone
No. 160900952

Cecil R. Hedger and John Robinson Jr., Attorneys
for Appellant

Jonathan A. Dibble, Elaina M. Maragakis, and Erin
M. Adams, Attorneys for Appellees

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

APPLEBY, Judge:

¶1      Jodie K. Levitt is a neurosurgeon with a medical staff appointment and privileges at Salt Lake Regional Medical Center (SLRMC). After Levitt's privileges at SLRMC were temporarily suspended, she sued Salt Lake Regional Medical Center LP, Iasis Healthcare Holdings Inc., Alan Davis, and Wanda Updike (collectively, Defendants). Following discovery, the district court entered summary judgment in favor of Defendants. Specifically, the court concluded that Utah's statutory care review immunity protects them from Levitt's lawsuit absent a showing of bad faith or malice and concluded that Levitt had failed to produce evidence of bad faith or malice.

Levitt appeals, arguing that summary judgment was inappropriate because there were genuine disputes of material fact as to whether Defendants acted in good faith and without malice. We affirm.

BACKGROUND

¶2     In 2011, Levitt applied for a two-year renewal of her medical staff appointment and privileges at SLRMC.[1] Around December 29, 2011, she received a letter dated November 23, 2011, (the November 23 Letter) from SLRMC's chief executive officer (CEO) granting her a "six-month conditional reappointment." The November 23 Letter explained that Levitt's reappointment was "conditional" because she had "several peer reviews pending." That is, SLRMC had asked independent "neurosurgeons with fellowships in spinal surgery" to review several of Levitt's medical cases that SLRMC thought were potentially problematic.

¶3     After receiving the November 23 Letter, Levitt requested further information about why her reinstatement was conditional. Various SLRMC representatives "informed her that [they] could not talk with her about her cases that were being peer reviewed." These individuals generally denied Levitt's requests for information because they believed it was "a requirement to protect the peer review privilege." On two occasions, however, SLRMC provided Levitt with a list of her cases that had been sent for peer review.

---

1. "Because this matter was decided on summary judgment, we recite the facts and inferences in the light most favorable to the nonmoving party," *Bahnmaier v. Northern Utah Healthcare Corp.*, 2017 UT App 105, ¶ 2 n.1, 402 P.3d 796 (quotation simplified), which in this case is Levitt.

¶4    Around February 10, 2012, Levitt received a letter dated January 30, 2012 (the January 30 Letter) from SLRMC's Credentials Committee informing her that the Committee had reviewed six of her peer reviewed cases as well as "two other recent occurrences that [were] pending review." The January 30 Letter identified two issues of concern from Levitt's cases. First, several of her patients had experienced "CSF leaks."[2] To address this, the Committee requested that Levitt submit "a written protocol for handling CSF leaks in the future." Second, Levitt had performed "three wrong-site surgeries."[3] The letter said that wrong-site surgeries "are serious events and if another wrong-site occurrence happens, the Committee [would] discuss further action which could include termination of privileges." To address this issue, the Committee requested that Levitt submit "a written protocol as to how [she would] establish confirmation of correct site surgery in the operating room." The January 30

---

2. "CSF" means cerebrospinal fluid, which is "a watery fluid that circulates through the brain's ventricles (cavities or hollow spaces) and around the surface of the brain and spinal cord." Cerebrospinal Fluid (CSF) Leak, *What is a cerebrospinal fluid (CSF) leak?*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/brain_tumor/center/skull-base/types/csf-leak.html [https://perma.cc/YAC5-RJLE]. "A CSF leak is a condition that occurs when the CSF leaks through a defect in the dura or the skull and out through the nose or ear." *Id.*

3. Wrong-site surgeries are "operations conducted on a different organ or body part than intended by the surgeon and patient." Peter J. Pronovost & Bryan Sexton, *Rx for Wrong-Site Surgery: Two Minutes of Conversation*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/news/media/releases/rx_for_wrong_site_surgery_two_minutes_of_conversation [https://perma.cc/WR2D-CKK2].

Letter informed Levitt that if she submitted the requested written protocols by March 1, 2012, she would receive "a three-month conditional reappointment." But it noted that the Credentials Committee would continue to review her cases "in a concurrent fashion."

¶5 On February 14, 2012, Levitt submitted the requested written protocols. That same day, CEO, Davis, and Updike[4] met with Levitt to discuss their concerns about a recent incident that "required immediate action." During the meeting, CEO, Davis, and Updike issued a twenty-eight day suspension of Levitt's surgical and medical privileges.

¶6 The following day, SLRMC sent Levitt a letter summarizing the suspension "per the [February 14] meeting." It said the suspension would last "at least 14 days," but that Levitt's privileges would be reinstated if she completed certain "criteria," including a "proctorship." That is, Levitt was to submit a plan for proctoring by a neurosurgeon of "one lumbar case," "one cervical case," and "four other cases to be proposed by [Levitt] and approved by the Chief of Staff that would pertain to the areas of clinical or procedural concern as discussed with [Levitt] in the meeting."

¶7 Levitt requested a hearing on her temporary suspension. Davis responded by email and informed her that a hearing would "not be done on an emergent basis." Instead, he told Levitt that she needed to request a hearing "within the 30-day window described in [the] bylaws," and it "would be scheduled for some time in the future." The email also said that, if Levitt completed her six proctored cases during the twenty-eight day

---

4. At this time, Davis was the chair of SLRMC's Medical Executive Committee and Updike was a member of that committee.

suspension, she would "not be reported to the National Practitioner Data Bank [(the NPDB)[5]] as having been suspended." Davis cautioned her that "proceeding with the hearing process would probably postpone a decision on her privileges beyond 30 days, which would then make her summary suspension reportable." Levitt did not respond to Davis's email or make any further request for a hearing. Instead, she "successfully completed the proctorship," and her medical staff appointment and privileges were reinstated.

¶8    In 2016, Levitt sued Defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with economic relations, and civil conspiracy. She alleged that Defendants' actions against her "were taken to accomplish the objective of destroying [her] reputation and of the wrongful goal of terminating [her] active staff membership at SLRMC and removing her from the hospital and marketplace."

¶9    After discovery, Defendants filed a motion for summary judgment. They asserted that they were immune from Levitt's claims under Utah's Health Care Providers Immunity from Liability Act, which protects health care providers from liability regarding decisions made about physician licensing and care review absent "clear and convincing evidence" of "bad faith" or "malice." (Citing Utah Code section 58-13-4.) And they argued that "the undisputed evidence show[ed] that [their] primary and sole purpose was to restrict incompetent behavior and protect patients."

---

5. The NPDB "is a web-based repository of reports . . . that prevents practitioners from moving state to state without disclosure or discovery of previous damaging performance." *About Us*, National Practitioner Data Bank, https://www.npdb.hrsa.gov/topNavigation/aboutUs.jsp [https://perma.cc/94DY-6GJT].

¶10 In her opposition to the motion for summary judgment, Levitt argued that there were genuine disputes of fact regarding whether Defendants acted in bad faith and with malice. To support her argument, she asserted that she was suspended "without prior notice" or "any explanation as to the reason," that she was denied a fair hearing under the medical staff bylaws, and that she was "forced to perform [the proctorship] within an arbitrarily restricted time frame in order to mitigate the damage done . . . to her professional reputation."

¶11 The district court granted Defendants' motion for summary judgment, concluding that they were "immune from [Levitt's] claims." Specifically, the court determined there was "no evidence that [Defendants] acted from any motive other than healthcare quality improvement and concern for patient care." Thus, Levitt "failed to rebut the presumption of good faith and lack of malice under Utah Code Ann. § 58-13-4."

¶12 Levitt appeals.

ISSUE AND STANDARD OF REVIEW

¶13 Levitt argues that the district court erred in granting summary judgment in favor of Defendants because "there were genuine disputed issues of material fact." Specifically, she asserts that, based on the evidence presented, "a reasonable jury could decide that there was clear and convincing evidence of [SLRMC's] bad faith and malice."[6]

---

6. Levitt's reply brief argues that the district court erred when it determined that certain documents were privileged and therefore not subject to discovery. Because Levitt did not raise this issue in her opening brief, we do not consider it on appeal. *See Brown v. Glover*, 2000 UT 89, ¶ 23, 16 P.3d 540 ("Generally,

(continued…)

¶14    We review a district court's decision to grant summary judgment "for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Nelson v. Target Corp.*, 2014 UT App 205, ¶ 11, 334 P.3d 1010 (quotation simplified). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). "In assessing whether [a party] has made a sufficient showing to withstand summary judgment, we take into account the substantive evidentiary standard of proof that would apply at a trial on the merits . . . ." *Christiansen v. Union Pac. R.R.*, 2006 UT App 180, ¶ 6, 136 P.3d 1266 (quotation simplified). We will reverse a district court's decision to grant summary judgment "if we conclude that a fair-minded jury could return a verdict for [the non-moving party] on the evidence presented." *Id.* (quotation simplified).

ANALYSIS

¶15    Under Utah Code section 58-13-4, health care providers serving in certain capacities, and the organizations or entities sponsoring them, are entitled to qualified immunity. Utah Code Ann. § 58-13-4(2) (LexisNexis 2016). For example, while "serving on committees . . . established to evaluate and improve the quality of health care," *id.* § 58-13-4(2)(a)(ii), health care providers "are immune from liability with respect to deliberations, decisions, or determinations made . . . *in good faith and without malice*," *id.* § 58-13-4(2) (emphasis added). Further, "[h]ealth care providers serving on committees . . . described in

_____

(…continued)

issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court.").

[section 58-13-4] are presumed to have acted in good faith and without malice, absent *clear and convincing evidence* to the contrary." *Id.* § 58-13-4(4) (emphasis added).

¶16    Levitt acknowledges that Defendants are entitled to a presumption of immunity under Utah Code section 58-13-4. And she attempts to rebut that presumption by arguing there is clear and convincing evidence of their bad faith and malice. Specifically, Levitt asserts that sufficient "bad faith [and malice] can be inferred from the totality of the circumstances regarding the conduct of the Defendants toward her." As discussed below, we conclude that Levitt has failed to produce sufficient evidence of bad faith and malice, and that Defendants are therefore immune from her claims as a matter of law. *See id.*; *see also Andalex Res., Inc. v. Myers*, 871 P.2d 1041, 1047 (Utah Ct. App. 1994) (explaining that "a party must prove a claim with clear and convincing evidence at the summary judgment stage if that is the burden required at trial").

¶17    Levitt makes various arguments attempting to show Defendants' bad faith or malice. We discuss each in turn.

¶18    First, she asserts that Defendants "refused to provide [her] with the reasons for [their] decisions . . . and refused to provide any justification for such refusal." She argues that a jury could infer bad faith from this "conspiracy of silence." We reject this argument because the record does not support it. The undisputed evidence shows that Defendants informed Levitt of the reasons supporting each of their decisions and actions. For example, the November 23 Letter said that Levitt's six-month reinstatement was "conditional" because several of her cases had been sent for peer review. The January 30 Letter explained further that Levitt's peer reviewed cases revealed "several CSF leaks" as well as "three wrong-site surgeries." Levitt even acknowledges that, on two occasions, Defendants provided her with lists of her potentially problematic cases that had been sent

for peer review. And CEO, Davis, and Updike each testified in sworn declarations that, prior to issuing Levitt's temporary suspension, they discussed with her the issues from her peer reviewed cases as well as a more recent incident that "required immediate action."

¶19　Granted, Defendants acknowledge that, on occasion, they "informed [Levitt] that [they] could not talk with her about her cases that were being peer reviewed." But this fact, without more, does not support an inference of bad faith or malice. *See Everett v. St. Ansgar Hosp.*, 974 F.2d 77, 80 (8th Cir. 1992) (declining to adopt the plaintiff's argument "that because the third-party review was conducted in secret, without his input as to who the reviewers should be, there is a necessary inference of malice"). Defendants presented undisputed evidence that "the lack of response to Levitt's inquiries for peer review information was to protect the peer review privilege."

¶20　On appeal, Levitt claims the peer review privilege "is a *post hoc* justification, not the reason for [Defendants'] secrecy." The problem with this theory is that Levitt has produced no evidence of an ulterior motive. Instead, she simply alleges that the "conspiracy of silence" was intended "to vex and frustrate [her] professional aspirations and damage [her] professional reputation." Such "bare allegations" are insufficient to support a reasonable inference of bad faith or malice. *See Nelson v. Target Corp.*, 2014 UT App 205, ¶ 25, 334 P.3d 1010. "[A] plaintiff cannot avoid summary judgment based on doubtful, vague, speculative or inconclusive evidence." *Id.* (quotation simplified).

¶21　Levitt also identifies "missteps" in communication, asserting that "Defendants made adverse decisions concerning [her] hospital privileges and repeatedly delayed sending notice of these decisions." That is, Levitt argues she "is entitled to an inference of bad faith" because she did not receive the November 23 Letter until late December and she received the

January 30 Letter around February 10. These "delays in communication" lend little support to Levitt's position. As Defendants note on appeal, "there is no evidence in the record showing the reason for these delays." Instead, Levitt simply asserts that Defendants delayed notifying her of their decisions as part of the alleged "conspiracy" against her. This argument is speculative at best, and we are not convinced that it supports even an inference of bad faith or malice. *See Kranendonk v. Gregory & Swapp, PLLC*, 2014 UT App 36, ¶ 15, 320 P.3d 689 ("A reasonable inference exists when there is at least a foundation in the evidence upon which the ultimate conclusion is based . . . ." (quotation simplified)). But even granting Levitt every favorable inference, any "delayed communication" does little to help Levitt meet her burden of establishing bad faith and malice by clear and convincing evidence.

¶22    Next, Levitt argues that a jury could infer bad faith from the "outright denial of her request for the fair hearing required in the bylaws." Again, the record does not support this argument. The evidence shows that, after Levitt was suspended, she requested an immediate hearing. In response, Davis informed her by email that a hearing "would not be done on an emergent basis." He explained that Levitt had "to request a fair hearing . . . within the 30-day window described in the bylaws," which would "be scheduled for some time in the future." It is undisputed that Levitt did not respond to Davis's email or make any further request for a hearing. Instead, she proceeded to "successfully complete the proctorship," which allowed her to regain her privileges at SLRMC and avoid having her suspension reported to the NPDB. Thus, the evidence seems to show that Levitt decided against a hearing, and we see no support for her allegation that her request for a hearing "was summarily, and maliciously denied by [Davis]."

¶23    Finally, we reject as unsupported by the evidence Levitt's argument that Defendants "maliciously" and "wrongfully"

issued the conditional reappointment and the temporary suspension. The November 23 Letter shows that Levitt's reappointment was "conditional" because several of her cases had been sent for peer review. The January 30 Letter shows that those peer reviewed cases revealed "several CSF leaks" as well as "three wrong-site surgeries." Further, the undisputed evidence shows that Levitt's temporary suspension resulted from yet another incident that "required immediate action." And the proctorship requirement was designed to address "the areas of clinical and procedural concern" that Defendants had identified and discussed with Levitt. Given this uncontroverted evidence, the only reasonable conclusion is that Defendants acted for the purpose of improving the quality of healthcare at SLRMC.

¶24   In short, no "fair minded jury," *Christiansen v. Union Pac. R.R.*, 2006 UT App 180, ¶ 6, 136 P.3d 1266 (quotation simplified), could conclude there is "clear and convincing evidence" that Defendants acted in bad faith or with malice, Utah Code Ann. § 58-13-4(4) (LexisNexis 2016). Accordingly, under Utah Code section 58-13-4, Defendants are immune from Levitt's claims.

CONCLUSION

¶25   The district court did not err in entering summary judgment in favor of Defendants. Under Utah Code section 58-13-4, Defendants are immune from Levitt's claims because Levitt failed to produce sufficient evidence of bad faith or malice. We affirm.

———————